**HTI HEALTH SERVICES, INC., Plaintiff,**

v.

**QUORUM HEALTH GROUP, INC., River Region Medical Corporation (Formerly known as ParkView Medical Corporation), and Vicksburg Clinic, P.A., Defendants.**

**Civil Action No. 5:96–CV–108Br(S).**

United States District Court, S.D. Mississippi, Western Division.

March 14, 1997.

Heber S. Simmons, III, Armstrong, Allen, Prewitt, Gentry, Johnson & Holmes, Jackson, MS, Wendy E. Ackerman, Steven C. Sunshine, Jonathan L. Greenblatt, Matthew David Lee, Thomas Aquinas McGrath, III, Linda M. McMahon, Shearman & Sterling, Washington, DC, for HTI Health Services, Inc.

Jon Randall Patterson, William N. Reed, Baker, Donelson, Bearman & Caldwell, Jackson, MS, Sean M. Haynes, W. Michael Richards, Baker, Donelson, Bearman & Caldwell, Memphis, TN, for Quorum Health Group, Inc.

William N. Reed, Baker, Donelson, Bearman & Caldwell, Memphis, TN, for River Region Medical Corp.

Todd C. Richter, Watson & Jernigan, P.A., Jackson, MS, John P. Sneed, Phelps Dunbar, Jackson, MS, for Vicksburg Clinic, P.A.

## OPINION

BRAMLETTE, District Judge.

Plaintiff HTI Health Services, Inc., d/b/a Columbia Vicksburg Medical Center ("Columbia") brought this antitrust action to enjoin a pending merger involving the defendants Quorum Health Group, Inc. ("Quorum Health"), River Region Medical Corporation (formerly known as ParkView Medical Corporation, referred to herein as "River Region") and the Vicksburg Clinic, P.A. (the "Vicksburg Clinic"). The co-defendants are referred to collectively herein as "Quorum". The merger is structured to align the two largest physician clinics in Vicksburg, Mississippi with one of the town's largest hospitals, ParkView Regional Medical Center ("ParkView"). ParkView's leading hospital rival, the Vicksburg Medical Center ("VMC"), is owned and operated by Columbia. Columbia is a wholly-owned subsidiary of Columbia/HCA HealthCare Corp., the largest for-profit hospital chain in the country. Quorum Health, the indirect majority shareholder of River Region, is also a large, for-profit health care corporation.

In its complaint filed July 29, 1996, Columbia alleged antitrust violations under the Sherman and Clayton Acts and requested preliminary and permanent injunctive relief to prohibit the merger's consummation. Following expedited discovery, the parties' opted to proceed directly to trial. The Court heard the case without a jury from September 30 through October 16, 1996. After the parties gave their closing arguments on November 6, 1996, the Court took the case under advisement. Now having thoroughly considered the record, legal arguments and case law, it is this Court's opinion, based on the findings of fact and conclusions of law to follow, that Columbia has failed to carry its burden of proof under the relevant antitrust laws. Columbia's request for injunctive and all other relief must therefore be denied.

## BACKGROUND

A long and competitive history of a divided medical community creates the setting for this contested merger. For many years, VMC and ParkView (previously named Mercy Hospital) have been considered the leading hospitals in Vicksburg and the surrounding areas of Warren County, Mississippi. Vicksburg, a city of roughly 30,000 people, is located in the southwest quadrant of the state on the Mississippi River border with Louisiana. Although in the past as many as four hospitals have operated in Vicksburg, ParkView and VMC are the only survivors, and the city has become a "two-hospital town."

The Street Clinic and the Vicksburg Clinic are the city's oldest physician clinics. Both have operated since approximately the World War I era, and both have maintained a traditional alliance with one of the two hospitals: the Street Clinic with ParkView and the Vicksburg Clinic with VMC. The Street Clinic is located on ParkView's medical campus, and physicians associated with that clinic are shareholders in River Region. The Vicksburg Clinic operates as a professional association and is officed on VMC's campus in space that it leases from Columbia. Without delving into the historic reasons for these hospital/clinic alliances, suffice it to say that the age-old schism running through Vicksburg's medical community has divided the dominant doctor and hospital groups into two, well-matched rivals.

According to the executed merger agreement dated May 31, 1996 among ParkView Medical Corporation (predecessor to River Region), ParkView Sub Inc. and the Vicksburg Clinic (the "Merger Agreement"), the merger is structured ·to accomplish a stock-for-stock swap between River Region and the Vicksburg Clinic. In short, once the merger is consummated, the Vicksburg Clinic physicians will join their longstanding rivals at the Street Clinic as shareholders of River Region. The merged clinics (referred to herein as the "River Region Clinic") will become the single largest physician clinic in the Vicksburg area.

Although the Street and Vicksburg Clinics are currently the largest and most diversely specialized clinics in Warren County, they are not the only ones. Mission Primary Care (the "Mission Clinic"), also located in Vicksburg, is a family medicine clinic that was established in 1995 and is managed by a Columbia-owned medical services organization, VIP, Inc. Other clinics in Vicksburg include the Better Living Clinic and two small clinics that are operated by River Region, The Family Medicine Clinic of Vicksburg and the Women's Clinic of Vicksburg. In addition to these smaller clinics, a number of independent physicians practice in and around Vicksburg. Columbia's VIP manages, in whole or in part, many of the independent physicians' practices.

The revolutionary reorganization of the health care industry, which has swept much of the country since the early 1990s, has been slow to arrive in Vicksburg. Innovations that are prevalent elsewhere, such as integrated health care delivery systems, intrastate and regional networking among hospitals and other providers, and managed care options in health insurance coverage, are new to the Vicksburg community. Essentially, managed care plans such as health maintenance organizations ("HMOs") and preferred provider organizations ("PPOs") negotiate with doctors, hospitals and other health service providers to establish a health care network that will serve the plan's enrollees. Because managed care plans purchase services in quantity, they negotiate for discounted rates from the health care providers, which, in principle, are passed along to customers in the form of lower health care coverage costs. With or without the pending merger, the expectation is that managed care will grow over time in Vicksburg and Warren County, thereby stimulating price competition as plan providers scramble for new customers. Managed care may make additional inroads into Warren County through a Medicaid managed care pilot program, which is slated to begin in eleven Mississippi counties but which was inactive at the time of trial.

Also new to Vicksburg is the growth of casino gambling. Along with the development of the casino industry, Vicksburg and Warren County are experiencing significant economic growth, a decline in unemployment

and the entry of new, nongaming businesses. Documents in evidence indicate that, between 1980 and 1994, Warren County's median family income increased 404% and its per capita income rose 126%.

Against this backdrop of changing times, a group of Vicksburg's independent physicians and clinic doctors formally met in the summer of 1993 to discuss ideas about reorganizing the area's hospital and medical services. One idea was to eliminate the duplication of services and procedures performed at the two hospitals by assigning a specific set of services to each hospital. For example, ParkView might be designated as the pediatric and ob/gyn center, while VMC would develop as the surgical care center. The hope was that, eventually, a new hospital could be constructed on a separate, neutral site and the old hospitals could be used for psychiatric units, nursing home facilities or other purposes. Another concern voiced by the physicians was Vicksburg's need for technologically advanced medical equipment including, but not limited to, a cardiac catherization laboratory, open heart surgery facilities and a permanent magnetic resonance imaging ("MRI") device. Because of intense competition between the two hospitals, neither had been successful in receiving the required approval from the state authorities for procuring such equipment. As a general rule, Mississippi requires that hospitals receive state regulatory approval in the form of a "certificate of need" or "CON" before capital expenditures for certain equipment or new technology may be incurred. In an attempt to end the regulatory gridlock, the Vicksburg doctors discussed approaching the CEOs of the two hospitals to encourage them to join forces and procure the cardiac catherization laboratory and MRI in a profit-sharing arrangement. The doctors hoped that, by forming a joint venture, the state regulators would no longer be forced to choose between the two hospitals and could award certificates of need to the unified project. Following the 1993 meeting, letters were sent to the executives of the owners of both hospitals, but the physicians' efforts failed. Vicksburg's need for technologically advanced equipment remained unresolved at the time of trial.

Dissatisfaction with the medical delivery system continued to grow among the community's physicians in general, and the Vicksburg Clinic physicians in particular. In December 1994, the nineteen physician shareholders at the Vicksburg Clinic wrote to the CEO of HealthTrust, owner and operator of VMC at that time, to complain about the hospital's failure to execute a several-year-old plan to expand the clinic's physical facilities and improve services. The physician group expressly requested a definite commitment from HealthTrust for expansion, recruitment and strategic planning and also requested a meeting with senior management to formulate such plans. In the spring of 1995, Columbia acquired HealthTrust and assumed the management and operation of VMC. Thereafter, the Vicksburg Clinic's executive committee met with Columbia management to discuss the clinic's continuing need for expanded office space, strategic planning concerns and the doctors' perception that Columbia's management service organization, VIP, Inc., was competing directly with the Vicksburg Clinic's physician recruitment efforts. Despite verbal assurances from Columbia, tension increased between the Vicksburg Clinic physicians and Columbia management. By November 1995, the Vicksburg Clinic members had initiated discussions with both River Region and Columbia regarding proposals for reorganizing the clinic through an asset purchase or otherwise. Several months later, after considering proposals from both sides, the Vicksburg Clinic's board of directors and shareholders held a special meeting and voted to pursue River Region's stock acquisition proposal. By February 1996, the physicians and River Region had signed a letter of intent. Negotiations continued, and the parties entered into the Merger Agreement in May 1996.

Also in the spring of 1996, the merger participants received notice that the Department of Justice ("DOJ") had opened an antitrust investigation of the proposed acquisition. To date, DOJ has not filed suit or taken any action against the Vicksburg Clinic merger. In the absence of agency interven-

tion, Columbia filed this private civil action for injunctive and other relief.

## FINDINGS AND CONCLUSIONS

### I. Antitrust Claims

Columbia's offensive against the merger is two-fold. First, under Section 7 of the Clayton Act,[1] Columbia claims that the proposed merger is likely to substantially lessen competition in Vicksburg's physician, hospital and managed care markets. (Count I, Complaint.) The result, according to Columbia, will be higher prices for health care services and medical insurance coverage, which will harm the citizens of Vicksburg as well as employers such as Columbia. Second, Columbia alleges that Quorum violated Section 2 of the Sherman Act[2] by combining or conspiring to monopolize Vicksburg's physician and hospital services with the specific intent of making Vicksburg a "one hospital town." (Complaint, Count II.)

### A. Injunctive Relief Standard

Columbia has asked for both preliminary and permanent injunctive relief pursuant to Section 16 of the Clayton Act. Section 16 entitles private persons to sue for injunctive relief "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity...." 15 U.S.C.A. § 26 (West Supp.1996) [hereinafter "Section 16"]. Under Section 16, permanent injunctive relief may issue upon a demonstration of "threatened" injury, even though the plaintiff has not yet suffered actual injury. *Zenith Radio Corp. v. Hazeltine Research. Inc.,* 395 U.S. 100, 130, 89 S.Ct.

1562, 1580, 23 L.Ed.2d 129 (1969). In other words, a plaintiff may qualify for permanent injunctive relief under the statute by demonstrating a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation that is likely to continue or recur. *Id.* The remedy is flexible and may be adapted to achieve a reconciliation of the public interests that Congress sought to protect with competing private needs. *Id.* at 131, 89 S.Ct. at 1580–81.

When adjudicating preliminary injunction requests under the antitrust laws, the courts in this circuit require that the movant meet its burden under a well-established four-pronged test by proving that:

1. there is a substantial likelihood of success on the merits;

2. there is a substantial threat that the movant will suffer irreparable injury if the injunction is not issued;

3. the threatened injury to the movant outweighs any damage the injunction might cause to the opponent; and

4. the injunction will not disserve the public interest.

*H & W Indus., Inc. v. Formosa Plastics Corp., U.S.A.,* 860 F.2d 172, 179 (5th Cir. 1988); *Pearl Brewing Co. v. Miller Brewing Co.,* 1993 WL 424236 (W.D.Tex., Mar. 31, 1993), *aff'd,* 52 F.3d 1066 (5th Cir.1995).

The precedent in our circuit clearly warns that a preliminary injunction is an extraordinary remedy that can be granted only if the movant has clearly shown all four prerequisites. *Mississippi Power & Light v. United Gas Pipe Line,* 760 F.2d 618, 621 (5th Cir.

---

1. Section 7 of the Clayton Act provides in pertinent part:

 No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly....

 15 U.S.C.A. § 18 (West Supp. 1996).

2. Section 2 of the Sherman Act provides:

 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
 15 U.S.C.A. § 2 (West Supp.1996).

1985). Indeed, the Fifth Circuit Court of Appeals instructs that the grant or denial of injunctive relief must be the product of a reasoned application of the foregoing four factors and cannot be based solely on an inquiry into the underlying merits of the substantive antitrust claims. *H & W Indus.*, 860 F.2d at 179 (reversing the district court's denial of a preliminary injunction where the court's ruling was based solely on the underlying merits of the plaintiff's antitrust and breach of contract claims). With these principles in mind, the Court turns first to evaluate the likelihood of Columbia's success on the merits.

### B. Antitrust Injury

■ An initial merits issue that this Court must decide is whether Columbia has shown the threat of an "antitrust injury." *Cargill Inc. v. Monfort*, 479 U.S. 104, 108, 107 S.Ct. 484, 488, 93 L.Ed.2d 427 (1986); *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 98 (5th Cir.1988) (antitrust injury is a merits issue that must be decided at trial before a preliminary injunction can issue), *cert. denied*, 486 U.S. 1023, 108 S.Ct. 1996, 100 L.Ed.2d 228 (1988). Establishing a substantial likelihood of suffering antitrust injury is an overarching prerequisite to obtaining injunctive relief under Section 16; it is equally applicable to cases brought under Section 2 of the Sherman Act and those under Section 7 of the Clayton Act. *T.O. Bell v. Dow Chemical, Co.*, 847 F.2d 1179, 1182 & n. 4 (5th Cir.1988). Unless Columbia can establish its antitrust injury in this case, it will lack standing [3] to sue. *Phototron*, 842 F.2d at 98 (construing *Cargill*, 479 U.S. at 113, 107 S.Ct. at 491); *see also T.O. Bell*, 847 F.2d at 1182.

■ The United States Supreme Court has defined antitrust injury as " 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Cargill*, 479 U.S. at 109, 107 S.Ct. at 489 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)); *see also Associated Gen. Contractors*, 459 U.S. at 538–39, 103 S.Ct. at 908–09. In the wake of this Supreme Court precedent, the Fifth Circuit has further explained that antitrust injury is proof of an anticompetitive effect upon the plaintiff. *T.O. Bell*, 847 F.2d at 1182 n. 4. It is clear from this circuit's precedent that antitrust injury must be interpreted narrowly, *e.g., Anago Inc. v. Tecnol Med. Products, Inc.*, 976 F.2d 248, 249 (5th Cir.1992), and that the plaintiff's burden is a heavy one. *Phototron*, 842 F.2d at 98. Examples of anticompetitive effects that are accepted as proof of antitrust injury include increased prices and decreased output. Antitrust injury, however, does not encompass the threat of decreased competition. *Anago*, 976 F.2d at 249; *see also Pearl Brewing Co. v. Miller Brewing Co.*, 1993 WL 424236 (W.D.Tex.1993), *aff'd*, 52 F.3d 1066 (5th Cir.1995) (the fear of the loss of profits due to price competition is not antitrust injury) Similarly, the notion that a plaintiff is facing the specter of a monopoly or speculation that the plaintiff will be sold or go out of business is not enough to establish antitrust injury. *Phototron*, 842 F.2d at 100. In sum, it is clear from the case law that speculative statements about anticompetitive effects will not satisfy the narrow standard for establishing antitrust injury. *E.g., Anago*, 976 F.2d at 249; *Doctor's Hospital of Jefferson, Inc. v.*

---

**3.** The Supreme Court has explained that the doctrine of antitrust standing demands a showing of more than the constitutional standing requirement of injury in fact; a plaintiff must also demonstrate that it is the proper party to bring a private antitrust action. *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983). In suits for damages, courts may assess several factors in an antitrust standing analysis: (1) the nature of the plaintiff's alleged injury (i.e., whether the plaintiff can prove antitrust injury); (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative

recovery; and (5) the complexity in apportioning damages. *T.O. Bell*, 847 F.2d at 1183 (construing *Associated Gen. Contractors*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723). The Supreme Court, however, has distinguished the standing analysis for injunctive relief under Section 16 by explaining that some of the factors (other than antitrust injury) that are appropriate to a determination of standing in an action for damages are not relevant in an action for injunctive relief. Such irrelevant factors would include the threat of multiple lawsuits or duplicative recoveries. *Cargill*, 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6.

*Southeast Medical Alliance, Inc.,* 897 F.Supp. 290, 293 (E.D.La.1995) (expert's speculative statements about increased health care costs and an environment conducive to increased prices for inpatient and outpatient hospital care fell short of the strict Fifth Circuit standard for antitrust injury), *appeal pending,* No. 96–30220 (5th Cir. argued Oct. 3, 1996).

 In essence, Columbia asserts that it will suffer two separate types of antitrust injury from the merger: one being an anticompetitive horizontal injury in certain physician services and managed care purchasing markets and the other being a vertical injury in the acute inpatient hospital services market.[4] Columbia's theory of horizontal injury focuses on its assertion that the merger will empower Quorum to raise prices for a number of physician services in Vicksburg. In its capacity as an employer of over 400 employees in the Vicksburg community and as a purchaser of physician services for these employees, Columbia contends that it is a proper plaintiff under the antitrust laws to challenge the alleged harm. *See Blue Shield of Va. v. McCready,* 457 U.S. 465, 481–84, 102 S.Ct. 2540, 2549–51, 73 L.Ed.2d 149 (1982) (consumer of mental health services had standing to challenge anticompetitive conduct in psychotherapy market). In addition, Columbia claims that it will suffer horizontal injury in the managed care purchasing markets because, as a self-insured employer, it is

in the process of "seeking to contract" for managed care physician services for its employees. Columbia argues that, after the merger, "it will no longer be able to play the two multispecialty physician groups in Vicksburg against each other" in price negotiations. Letter from Columbia to the Honorable David C. Bramlette (11/13/96) at 5 [hereinafter "Columbia Posttrial Letter"].

Columbia also asserts that it will suffer a separate injury from the likely vertical effects of the merger. Columbia argues that by virtue of the postmerger economic integration of the Vicksburg Clinic and Park-View, Quorum will have the power and economic incentive to foreclose Columbia from the acute care hospital services market. This anticompetitive vertical effect will result, according to Columbia, from the Vicksburg Clinic physicians' financial incentive and ability to shift their patient admissions to ParkView (instead of VMC) and from Quorum's postmerger power to exclude Columbia from competition for managed care contracts.

In response, Quorum urges that Columbia's entire standing argument rests entirely on speculation of what might happen postmerger and is therefore insufficient to demonstrate antitrust injury under the Fifth Circuit's narrow standard. Quorum further argues that Columbia has no standing to complain of injury in at least one of the alleged product markets—physician services

---

4. In broad terms, a horizontal merger occurs when the merging firms are in the same product and geographic market. 1984 DOJ Merger Guidelines § 3.0, *reprinted in* ANTITRUST LAWS AND TRADE REGULATION PRIMARY SOURCE PAMPHLET (Matthew Bender 1996) [hereinafter PRIMARY SOURCE]. The basic economic reason for limiting horizontal mergers is the generally accepted theory that horizontal mergers increase market concentration, which, in turn, can substantially lessen competition among rivals, particularly with respect to price. 4 PHILLIP AREEDA & DONALD R. TURNER, ANTITRUST LAW ¶ 1000a (1980).

In contrast, a vertical merger joins companies that share a supplier-customer relationship. *Brown Shoe v. United States,* 370 U.S. 294, 323, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). Unlike horizontal mergers, vertical arrangements do not inherently remove an independent competitor from the market. 2A PHILLIP AREEDA, HERBERT HOVENKAMP & JOHN L. SOLOW, ANTITRUST LAW ¶ 570a (1995). Vertical integration

gration may be "upstream" (when a firm produces supplies or component materials that could have been supplied by independent producers) or "downstream" (when a firm processes or distributes products that could have been sold to independent producers or distributors) 3 AREEDA & TURNER, *supra,* at ¶ 723.

Whereas horizontal mergers are commonly analyzed in terms of market concentration, there is no comparable theoretical basis for evaluating the anticompetitive effects of a vertical merger. This is because firms that merge vertically are engaged in different product markets; thus, a simple vertical merger neither combines market concentrations nor increases the market power of the merging entities. 4 *id.* at ¶ 1000(a). Courts therefore evaluate the anticompetitive effects of a vertical merger in terms of other structural consequences or economic barriers such as whether the merger "forecloses" competitors of the merging entities from a source of supply that would otherwise be open to them. *Id.; see also Brown Shoe,* 370 U.S. at 324, 82 S.Ct. at 1523.

purchased by managed care—because, as a factual matter, Columbia is neither a managed care company nor an employer that purchases managed care products.

Recognizing the fundamental importance of the antitrust injury prerequisite to the viability of Columbia's lawsuit, the Court requested and received supplemental briefing from the parties on the issue of standing. Having thoroughly reviewed and considered the supplemental briefing, counsel's oral arguments at trial on this issue and the many other written briefs, documents and case law submitted to the Court by the parties, it is this Court's conclusion that Columbia has established the requisite threat of antitrust injury and, accordingly, has standing to sue for injunctive relief under Section 16.

Because of the arguably speculative nature of Columbia's complained injury, the Court acknowledges, particularly in the light of this circuit's narrow standard, that some might regard this as a close call. However, the precise antitrust laws at issue in this case expressly require courts to deal in uncertainties and make reasoned assessments of the probable future effects of a proposed business transaction. *See United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1286 (7th Cir.1990) ("It is regrettable that antitrust cases are decided on the basis of theoretical guesses as to what particular market-structure characteristics portend for competition. . . . "). Based on Columbia's thorough pleading and briefing, which cannot be criticized as "bare bones," it is this Court's view that Columbia's allegations of antitrust injury must not be lightly dismissed as speculative and are sufficient to persuade this Court that a serious analysis of the full merits of this case is warranted. The Court's conclusion at this early stage of its consideration is supported by the following evidence.

Mr. William Patterson, chief executive officer of VMC, testified credibly that Columbia is a purchaser of hospital and physician services for its employees in the Vicksburg mar-

ket. (Trial Tr. at 1653.) The fact that Columbia purchases health care services in the Vicksburg market was not contested by Quorum's expert witness, Mr. Lloyd E. Oliver. (*Id.* at 2632.) The parties do not dispute that, following the merger, the surviving clinic will be the largest physician clinic in the Vicksburg area and the only multispecialty physician clinics [5] in Vicksburg. It will possess, as a statistical matter, high percentages of market share in the alleged physician services markets. According to Dr. David Eisenstadt, Columbia's expert witness, these market share percentages demonstrate a substantial likelihood of monopoly power in the alleged physician services markets. It appears to this Court that Columbia's allegations of postmerger market concentration raise, at the very least, a classic antitrust issue: whether the effect of the merger may be to substantially lessen competition in the alleged product markets and hurt consumers by empowering the postmerger survivors to raise prices. *E.g., Rockford*, 898 F.2d at 1282–83. This is precisely the type of injury that the antitrust laws are designed to prevent. *Cargill*, 479 U.S. at 109, 107 S.Ct. at 488; *see also Community Publishers. Inc. v. Donrey Corp.*, 892 F.Supp. 1146, 1167 (W.D.Ark.1995) (protecting consumers from monopoly prices is the central concern of antitrust law).

The Court's analysis of Columbia's showing of antitrust injury does not rest on the evidence of market share data alone. *See Community Publishers*, 892 F.Supp. at 1167 (interpreting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), as rejecting the proposition that antitrust injury may be presumed on the basis of market share data). Among other things, the Court has considered the abundant testimony regarding the historic competition and rivalry between the Street Clinic and the Vicksburg Clinic. The testimony indicated that the two clinics have been direct and significant competitors not

---

**5.** Multispecialty physician clinics have been described as an alternative to the traditional, single specialty practices offered by members of a medical staff. In general, multispecialty clinics are designed to provide "one-stop shopping" for various medical specialties and are intended to be a

cost-effective means of health care delivery. They may also provide extended hours, house calls and other patient benefits. See Remarks of Mary Lou Steptoe, Acting Director FTC Bureau of Competition, delivered 4/5/95 to ABA Antitrust Section, *reprinted in* 1995 WL 150724 (F.T.C.).

just in terms of price, but also on the basis of quality and services offered. Even without the assistance of market share data, the fact that the merger will eliminate this tradition of multifaceted competition between the city's two leading, rival clinics is enough to raise concerns about the threat of postmerger anticompetitive effects.

Considering the high postmerger market concentrations in the physician markets that Columbia has alleged and demonstrated, coupled with evidence regarding the consequences of the merger, the Court is satisfied that Columbia has shown the requisite threat of antitrust injury and has presented something more than "the notion that (it is) facing the specter of a monopoly." *Phototron*, 842 F.2d at 100.

Arguably more speculative is Columbia's theory of vertical injury in the acute care inpatient hospital services market. The linchpin of this theory is Columbia's contention that, because the Vicksburg Clinic physicians will become postmerger equity shareholders in River Region Medical Corporation, these physicians will have a financial incentive, directly caused by the merger, to send their patients to ParkView for hospital services. Conceding that these physicians will have no postmerger contractual obligation to refer their patients to ParkView, Columbia maintains that the merger nonetheless creates the threat that Columbia will lose its primary source (or upstream supply) of hospital patient referrals and thereby become foreclosed from competing in the downstream market of acute care inpatient hospital services. In this regard, the Court noted the testimony of Dewey Greene, President of Columbia's Delta Division, who stated that the Vicksburg Clinic physicians account for 80% or more of VMC's total patient activity. (Trial Tr. at 533.) It is well-established that the primary vice of a vertical merger is foreclosing a competitor from a key source of supply that, absent the merger, would otherwise be open to it. *Brown Shoe*, 370 U.S. at 324, 82 S.Ct. at 1523. Setting aside the ultimate merits of this contention (which are addressed in Part I.C. below), the Court cannot ignore the allegation that the merger creates a questionable financial incentive for

the Vicksburg Clinic physicians to steer their hospital patients to ParkView rather than VMC. But for the merger, this unique financial incentive would not exist. Finding that the alleged incentive is not beyond the realm of possibility, the Court concludes that Columbia has demonstrated the requisite threat of antitrust injury. *See Community Publishers*, 892 F.Supp. at 1167 (holding that a plaintiff/newspaper-owner had established the requisite threat of antitrust injury and therefore had standing to challenge a local newspaper acquisition because the transaction would create an incentive for the target newspaper to terminate its advertising sharing agreement with the plaintiff). Satisfied with Columbia's demonstration of threatened antitrust injury from both the horizontal and vertical effects of the proposed merger, the Court will proceed to evaluate Columbia's likelihood of success on the merits of these antitrust claims.

## C. Merits of Section 7 Clayton Act Claim

In assessing the merits of Columbia's Section 7 claim, this Court must appraise not merely the immediate impact of the merger upon competition, but it also must predict the merger's impact upon competitive conditions in the future. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963). The burden is on Columbia to show that a probable anticompetitive impact will flow from the merger. *Domed Stadium Hotel, Inc., v. Holiday Inns. Inc.*, 732 F.2d 480, 492 (5th Cir.1984). To do so, Columbia must show that the merger of the two clinics will substantially lessen competition within an established "area of effective competition," or relevant market. *Brown Shoe*, 370 U.S. at 324, 82 S.Ct. at 1523. A relevant market is determined by proof of a(1) product market (the line of commerce); and (2) geographic market (the section of the country). *Id.; see also Domed Stadium*, 732 F.2d at 491 (first step in analyzing a Section 7 claim is defining the relevant product and geographic markets). Instead of mandating a formal or legalistic structure for defining relevant markets, Congress has adopted a pragmatic, fac-

tual approach. *Brown Shoe*, 370 U.S. at 336, 82 S.Ct. at 1530.

### 1. The Alleged Product Markets

█ The burden is on the plaintiff to prove the relevant product market or markets. *Coastal Fuels of Puerto Rico. Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182 (1st Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 294, 136 L.Ed.2d 214 (1996); *C.E. Services., Inc. v. Control Data Corp.*, 759 F.2d 1241 (5th Cir.), *cert. denied*, 474 U.S. 1037, 106 S.Ct. 604, 88 L.Ed.2d 583 (1985). Determining a relevant product market is generally a question of fact for the jury or factfinder, although in certain instances a legal conclusion is required. *Seidenstein v. Nat'l Medical Enter., Inc.*, 769 F.2d 1100, 1106 (5th Cir.1985); *Domed Stadium*, 732 F.2d at 487. The classic test for defining the outer boundaries of a specific product market is to identify a set of goods or services that are reasonably interchangeable by consumers for the same purpose or use. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524; *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); *Dougherty v. Continental Oil Co.*, 579 F.2d 954, 963, n. 4 (5th Cir.1978)(a product market is "composed of products that have reasonable interchangeability for the purposes for which they were produced-price, use and qualities considered"). Interchangeability of products is often explained in terms of the "cross-elasticity of demand" between the product itself and substitutes for it. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524. This concept considers the alternative products to which consumers might turn in the event of a price increase. HERBERT HOVENKAMP, ECONOMICS AND FEDERAL ANTITRUST LAW § 3.3 (1985). A high cross-elasticity of demand between two products indicates, for antitrust purposes, that the products are in the same relevant product market. *Id.*

Consistent with Supreme Court precedent, the factfinder may also determine that well-defined submarkets exist within a specific product market. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524. Economically significant submarkets themselves can constitute relevant product markets and are often determined by examining: industry or public recognition of the submarket as a separate economic entity; the product's peculiar characteristics and uses; unique production facilities; distinct customers; distinct prices; sensitivity to price changes; and specialized vendors. *Id.; Domed Stadium*, 732 F.2d at 487–88.

Columbia has focused on two broad categories of product markets: physician services and hospital services. Within the physician services category, Columbia has sought to prove four distinct product markets: (1) primary care; (2) general surgery; (3) urology; and (4) otolaryngology (ear-nose-throat or "ENT"). In addition, Columbia argues that two submarkets exist in the physician services category, which are pediatrics (a submarket of primary care) and physician services purchased by managed care (also referred to during the course of this litigation as the "multispecialty clinic submarket"). The Court concludes that, except for physician services purchased by managed care, Columbia has alleged proper product markets. The Court will address each product market and submarket.

### a. Primary Care

According to Columbia, the primary care market in Vicksburg consists of general practitioners, family practitioners, internists and, as a distinct submarket, pediatricians. Columbia deliberately excludes obstetricians and gynecologists ("ob/gyn") from its definition of the primary care market on the grounds that (i) ob/gyns do not typically provide routine primary care services to their female patients in the Vicksburg area; (ii) managed care plans could not use an ob/gyn to substitute for a primary care physician in forming a physician panel; and (iii) only adult women seek out ob/gyns for services.

Although Quorum does not dispute the recognition of primary care as a relevant product market, it does dispute Columbia's proposed market make-up. Quorum contends that the primary care market includes family practitioners, pediatricians, internists and ob/gyns. Quorum also denies that pediatrics is a separate submarket. In support of

its position, Quorum points to Drs. Sessums and Giffin, family practitioners at the Mission Clinic. Each of these doctors dedicates 20% or more of his practice to providing pediatric care to children. On the other hand, Quorum names no specific Vicksburg area physician who provides both ob/gyn and routine primary care services to patients.

Having considered the evidence and the interchangeability of the services at issue, the Court accepts Columbia's definition of primary care for the purposes of this antitrust lawsuit. On this issue, the Court found informative the testimony of Columbia's expert, Dr. Eisenstadt, who stated his belief that general practitioners, family practitioners and internists in the Vicksburg area are considered "in some sense substitutable for one another and therefore they could be called primary care physicians." (Trial Tr. at 2116.) Dr. Eisenstadt further testified that, while pediatricians provide primary care to children, they cannot substitute for internists or general practitioners in the formation of a managed care panel. (*Id.* at 2117.) From an antitrust market-definition perspective, Dr. Eisenstadt concluded that pediatricians would be a relevant submarket under primary care physicians. However, Dr. Eisenstadt neither included ob/gyns in the primary care market nor considered them as a submarket of primary care based on his belief that women in the Vicksburg area would not routinely use an ob/gyn for primary care purposes.

Dr. Eisenstadt's opinion was partially corroborated by Ms. Sharon Petty, vice-president and CFO of the Ameristar Casino in Vicksburg. As a health benefits provider to over 1,000 employees, Ms. Petty stated that she could not offer her employees an ob/gyn or a pediatrician as a substitute for an internist. (*Id.* at 1180–81.)

The record does not identify any specific ob/gyn in the Vicksburg area who is generally capable of providing primary care services

to the population as a whole and who would therefore be an acceptable substitute for general practitioners, family practitioners or internists. The testimony regarding the extent to which Vicksburg area ob/gyns provide primary care services to women patients was vague and unsubstantiated. *See, e.g., id.* at 1122 (testimony of Dr. Fagan citing unnamed surveys to support the notion that one-third of all women see only a gynecologist as a physician); *id.* at 2662 (Quorum's expert incorrectly citing Dr. Fagan for the proposition that 70% of all women see only an ob/gyn). Recognizing that Columbia's proposed definition of the primary care market may not be perfect,[6] it is nonetheless adequately defined and inadequately refuted for the purposes of obtaining Clayton Act relief. *Rockford,* 898 F.2d at 1285 (forced to chose between two imperfect market definitions, court of appeals chose the less imperfect one).

### b. Other Physician Markets

The additional physician markets proposed by Columbia (general surgery, urology and ENT) are unopposed by Quorum in its final briefing to this Court. At trial, Quorum's expert, Mr. Oliver, accepted general surgery and urology as appropriate markets.[7] Mr. Oliver expressed some reservation about the proposed ENT market because there was testimony at trial suggesting that Dr. Bradfield, an ENT at the Vicksburg Clinic, might have intentions of leaving the Vicksburg area. In the event that Dr. Bradfield left Vicksburg, Mr. Oliver suggested that the postmerger monopoly in ENT could disappear. With respect to the task at hand—defining relevant product markets that are supported by the record evidence—the Court finds that speculation about what Dr. Bradfield might or might not do lacks probative value. In the light of little to no opposition from Quorum, the Court accepts Columbia's definition of the physician product markets for general surgery, urology and ENT.

**6.** For example, it is not entirely clear (logically speaking) why pediatricians should be considered a submarket of primary care but ob/gyns are not. Neither party has proposed this seemingly plausible, parallel submarket structure nor introduced evidence to support it.

**7.** DOJ's Antitrust Division has recognized that general surgery services are ordinarily considered a separate product market. *See* DOJ Business Review Letter, 1996 WL 285712 (D.O.J.), at n. 1 (March 19, 1996).

#### c. Submarket of Physician Services Purchased by Managed Care (or the "multispecialty clinic submarket")

■ Columbia's proposed submarket for physician services purchased by managed care,[8] also referred to as the "multispecialty clinic submarket," is not so easily demarcated as the preceding practice specialties. Indeed, Columbia itself has exhibited some difficulty throughout this litigation in naming and presenting a consistent, well-defined statement of the market that it now asks this Court to recognize. Initially, Columbia sketched a separate product market (not submarket) of "managed care contracting for physician *and hospital* services." (Complaint ¶ 44, emphasis added). This description has evolved into Columbia's latest articulation on the subject, which depicts a leaner submarket without the added weight of hospital services:

> Plaintiff also alleged ... and proved a submarket [of the physician services product market] consisting of physician services purchased by managed care plans. This submarket can also be referred to as a multispecialty clinic submarket in Vicksburg because of the configuration of doctors in Vicksburg—two multispecialty clinics and only a few independent physicians. Given this configuration, a managed care plan must purchase physician services from one of the two multispecialty clinics to have a marketable panel. Whether this market is called a "multispecialty clinic submarket" or "physician services purchased by managed care submarket," it does not change the fact that without the merger there are only two significant sellers of physician services in Vicksburg—the Vicksburg Clinic and the Street Clinic—

and after the merger there would be only one—River Region.

Columbia Posttrial Letter at 3.

Having studied Columbia's most recent effort to nail down a definition of this seemingly slippery submarket, the Court refers to the testimony of Columbia's own expert witness, Dr. Eisenstadt. Contrary to Columbia's written and oral arguments to this Court, Dr. Eisenstadt specifically asserted on cross-examination that managed care purchases of multispecialty clinic services are not a submarket, but rather a separate product market. (Trial Tr. at 2292.) Dr. Eisenstadt also described multispecialty clinic services as a "cluster of services" market.[9] Columbia, however, has not pursued this theory in its final briefs or arguments to this Court. (*Id.* at 2125.)

It is the plaintiff's burden to define its product markets, *C.E. Services,* 759 F.2d at 1244, and the Court now has before it a cafeteria of differing definitions from which to chose. On the basis of these inconsistencies alone, some might find that Columbia has failed to define its product market sufficiently. The Court, however, will disregard Columbia's earlier variations on the theme of managed care and multispecialty clinics and will focus its attention on the final interpretation, cited in pertinent part above. *See* Columbia Posttrial Letter at 3–4.

Quorum vigorously argues against the proposed multispecialty clinic submarket on the ground that Columbia is attempting to allege an invalid cluster of services market. According to Quorum, multispecialty clinics do not gather complex, interrelated and interdependent services under one roof like commercial banks (*see supra* note 9); rather, they offer separate and sometimes competing

---

**8.** A managed care executive testified at trial that he defines managed care as the "application of any number of methodologies to health care delivery" with the purpose of achieving two goals: (1) increasing efficiency; and (2) increasing the quality of a health care delivery system. (Trial Tr. at 260.)

**9.** In cases involving service industries such as banking and retailing, courts sometimes recognize a "cluster of services" as the relevant product market. *E.g., Philadelphia Nat'l Bank,* 374 U.S. at 357, 83 S.Ct. at 1738 (products and

services constituting commercial banking were sufficiently inclusive to be deemed a distinct line of commerce).

The reliability of using a cluster of services approach in evaluating hospital mergers has been called into question recently by the court in *F.T.C. v. Butterworth Health Corp.,* 946 F.Supp. 1285 (W.D.Mich. 1996). In light of the evolving and increasingly complex health care services market, the *Butterworth* court expressed a concern that the cluster approach might lead to distorted results. *Id.* at 1300 n. 5.

services that are available independently elsewhere. Relying on *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir.1995), Quorum further argues that purchases by managed care are nothing more than discounted pricing methods and, like an HMO (which is a form of managed care), do not constitute a separate product market. *Id.* at 1409, 1411 (reversing jury finding that HMO was a separate product market; "HMO is basically a method of pricing services").

This Court is aware of no precedent that has recognized either physician services purchased by managed care or multispecialty physician clinics as a relevant product market (and/or submarket) under the antitrust laws. In the absence of precedent bearing directly on point, the Court will depend on conventional antitrust tools to parse an arguably unconventional market. *See, e.g., Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524; *see also supra* discussion at Part I.C.1.

A review of the facts regarding the current state of managed care in Vicksburg is essential to determining whether the market segment identified by Columbia qualifies as an economically significant submarket under the *Brown Shoe* doctrine. On this issue, the Court found credible the testimony of Charles Pitts, CEO of United HealthCare of Mississippi, Inc. ("United Health"), a subsidiary of a nationwide managed health care services company. Mr. Pitts also serves as board chair of Mississippi's HMO trade association and testified that he is familiar with the development of managed care nationwide and, most importantly, in Mississippi. (*See generally* Trial Tr. at 258–379.) Pitts stated that, compared with the rest of the country, managed care is in its infancy in Mississippi. He estimated that only 1% to 2% of Mississippi's population is enrolled in an HMO product (compared with 20% to 25% for the nation as a whole). Within Mississippi, the HMO industry is better-established in the southeast corner of the state as compared to Vicksburg, which is one of the industry's newer locations. Pitts further testified that United Health has marketed its managed care products in Vicksburg only since March 1996, although United Health recently acquired a company that has been offering "a product" in Vicksburg for several years. Pitts did not offer any specifics about the product or its performance record.

Pitts's testimony regarding the infancy of managed care in Mississippi was confirmed by the testimony of Dr. Eisenstadt (*id.* at 2399), by the testimony of Rissa Richardson, a provider relation manager for American Medical Plans of Mississippi (*id,* at 388), and by Columbia's own documents. (Exhibit DQ–121, p. HCA9685 (VMC's Strategic Review FY '96 noting "relatively immature status" of managed care)). Ms. Richardson explained that her company markets both commercial and Medicaid HMO/managed care products in Mississippi. At the time of trial, American Medical had no Vicksburg enrollees for its commercial product, and the anticipated Warren County Medicaid pilot program (in which Richardson hopes to participate as an HMO provider) had not begun operations. Richardson testified that there are only fourteen HMOs in Mississippi, all in varying stages of development including those with membership, those that are poised to begin services, and those "that are just in the loose stages of forming and developing." (Trial Tr. at 385.) With respect to managed care companies, Richardson further stated, ". . . almost everyone in Mississippi is a new kid on the block." (*Id.* at 388.)

The Court found informative Mr. Pitts's testimony about his company's efforts to construct its Vicksburg network of physician providers.[10] At the time of trial, United Health had contracted with primary care physicians and specialists who practice independently in the Vicksburg area and at the

---

10. As used in the managed care industry, Pitts defined "provider" to mean anyone who delivers health care services such as physicians, hospitals, home health agencies and emergency service companies. Perhaps most frequently, the term is used in reference to physicians. A "network of providers" refers to the total health care delivery system constructed by the managed care company and offered to its customers. The network is comprised of all health care providers who have contracted with the managed care company to provide health care services. (Trial Tr. at 270–71.)

Vicksburg Clinic. According to Pitts, the "rule of thumb" in developing a network of physician providers is to attempt to contract with representatives of every service available in the market (primary care physicians, cardiologists, etc.) and to secure as large a representation as possible. Pitts stressed that, particularly in a fledgling managed care market like Mississippi, a managed care product designer needs to attract new customers by offering the broadest physician choice possible in its provider network. Ideally, the network would include from 40% up to 100% of the primary care physicians available in the local market; in Vicksburg, it also would include physicians located in towns within close proximity to Vicksburg and Jackson specialists, if none are available in Vicksburg. By way of example, Pitts testified that it would not be desirable, from a marketability standpoint, to contract solely with the Mission Clinic in establishing his network of physician providers because this would result in a very limited representation. He conceded, nonetheless, that the five or six primary care physicians associated with the Mission Clinic would be sufficient to service the adult primary care needs of his company's entire customer population in Vicksburg and Warren County.

Similarly, Ms. Richardson testified that health care consumers prefer a broad choice of physicians on HMO provider panels. In terms of marketability, Richardson stated that she would want to have at least one of the two largest clinics in Vicksburg on her panel. Although she already has a contract with the primary care physicians at the Vicksburg Clinic, she nonetheless has contracted with other physicians, including those at the Mission Clinic and the Better Living Clinic. Richardson testified that her company is continuing to meet and negotiate with physicians in order to broaden its Vicksburg provider panel.

Based on the evidence, including the aforementioned trial testimony, the Court finds as a fact that the managed care industry is still in its early stages of development in the Vicksburg area. Indeed, managed care pro-

viders are just beginning to enter the Vicksburg health care market. They are in the process of simultaneously building the broadest possible provider panels and establishing first-time client relationships with area employers. At this juncture, managed care purchases of physician services in Vicksburg can hardly be described as a well-defined, economic entity within the meaning of *Brown Shoe*.[11] In sum, it is this Court's view that Columbia is, at best, precipitous in seeking submarket status for a very limited and economically immature segment of the Vicksburg physician services market. *See F.T.C. v. Butterworth Health Corp.*, 946 F.Supp. 1285, 1300 & n. 5 (criticizing the FTC for its artificial and misleading focus on recipients of hospital services purchased by managed care at discounted rates—a very limited segment of hospital care consumers).

The premise of Columbia's proposed multispecialty clinic submarket is that, postmerger, a managed care plan must purchase physician services from the River Region multispecialty clinic in order to have a marketable provider panel. At the heart of this premise is Dr. Eisenstadt's opinion that, in communities where multispecialty clinic services are available, managed care plans prefer to "one-stop shop" at the multispecialty clinic, rather than build a provider panel of smaller clinics and independent physicians. (Trial Tr. at 2044.) In essence, Columbia claims that the River Region Clinic will be the only place to one-stop shop in Vicksburg after the merger and that no substitute for this multispecialty clinic will be available to managed care plans. The Court concludes that Columbia's fundamental premise in this regard is unfounded.

It is well-established that, in defining a market, one must determine whether products or services exist that are good substitutes for the product or service in question. *BrownShoe*, 370 U.S. at 325, 82 S.Ct. at 1524; *see generally* ANTITRUST ADVISER § 1.23 (Irving Scher ed.1995). Based on the testimony of Charles Pitts, the Court finds as a fact that physicians not associated with the Vicksburg and Street Clinics are currently

---

**11.** The Court notes that the record is silent as to the total dollar amount of multispecialty physi-

cian services purchased by managed care in Vicksburg or anywhere else.

being used by, and are available for use by, managed care plans. Nothing in the record suggests that independent physicians in the Vicksburg area or physicians associated with the smaller Vicksburg clinics (e.g., the Mission Clinic) are incapable of providing acceptable physician services to managed care plans. To the contrary, the testimonial and documentary evidence indicates that a number of physicians such as Drs. Sessums (Mission Clinic), Daniel Dare (Southern Orthopedics), Yoshinobu Namihira (Better Living Clinic), Roy Kellum, Joel Payne, Earl Stubblefield and James Tucker serve on managed care panels. (Trial Tr. at 146, 148–49, 283; Exhibits DVC–373; DQ–532, –533, –534, –535, –536, –541, –545, –546, –547 and –551; PX–454.) Pitts voiced no dissatisfaction with the independent physicians currently serving on his company's panel and expressed a clear desire to sign up as many of these doctors as possible. It therefore appears to this Court that there is an inconsistency between Dr. Eisenstadt's opinion and the testimony of Mr. Pitts. Although Dr. Eisenstadt's opinion regarding one-stop shopping may hold true in other parts of the country, the Court finds that it is not the rule in Vicksburg's yet-to-be-developed managed care market. As Mr. Pitts credibly testified, the best standard in Vicksburg is an offering of the broadest physician choice possible at this stage of managed care development. The Court further notes that, even if one-stop shopping were the preference of managed care companies in Vicksburg, there is nothing in the antitrust laws or in our precedent that protects a consumer's shopping preference where viable substitutes are available in the market. Simply put, the antitrust laws protect consumer access to free and competitive markets; they do not protect the personal likes and dislikes of every consumer in that market.

Thus, in the total absence of evidence to prove the incompetence of any Vicksburg area physician who is not associated with the Vicksburg or Street Clinics, this Court finds as a fact that, from an antitrust perspective, valid substitutes for the physician services offered by the two dominant clinics not only

exist in Vicksburg but they are being solicited by managed care providers.

Before leaving this issue the Court notes that, to the extent Columbia is claiming submarket status based on the distinct discount pricing that is associated with managed care purchases (*see* Columbia Posttrial Letter at 4), the Court rejects this argument as myopic. Although distinct pricing is one of the indicia to be considered under the *Brown Shoe* submarket test, the seven factors listed in *Brown Shoe* are neither comprehensive nor definitive and must be applied in accord with the peculiar attributes of any given market and the specific facts of a given case. Considering the totality of the record evidence in this case, Columbia's proposed submarket of managed care purchases of physician services does not pass muster under *Brown Shoe*. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524; *see also Marshfield Clinic*, 65 F.3d at 1409, 1411 (HMO, a method of discount pricing, was not a separate product market in the light of record evidence).

#### d. The Hospital Market

■ Columbia defines the relevant hospital services market as "acute inpatient hospital services provided *in common* by Parkview and VMC." (Plaintiff's Proposed Findings of Fact and Conclusions of Law at ¶ 116; emphasis in original.) Quorum offers no opposition to this market. In fact, Quorum's expert, Mr. Oliver, affirmatively testified that acute inpatient hospital services constitute a relevant product market in this case. (Trial Tr. at 2805.) The Court therefore finds that Columbia has identified an appropriate hospital services product market.

### 2. The Geographic Markets

The next hurdle that Columbia must overcome in presenting its prima facie case is to define the proper geographic market for each identified product market.[12] *See United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 669, 94 S.Ct. 2788, 2796, 41 L.Ed.2d 1016

---

**12.** Having already disposed of Columbia's proposed multispecialty clinic submarket, the Court has no need to address the evidence of geograph-

ic market for that product and no need to address any remaining issues related to that proposed submarket.

(1974) (burden of producing evidence of geographic markets rests with the plaintiff). A properly defined geographic market reflects the commercial realities of the industry at issue and is one that is economically significant. *Brown Shoe*, 370 U.S. at 336–37, 82 S.Ct. at 1529–30. The Fifth Circuit has explained that the geographic component of a relevant market definition encompasses the area of effective competition in which the product or its reasonably interchangeable substitutes are traded. *Hornsby Oil Co. Inc. v. Champion Spark Plug Co.. Inc.*, 714 F.2d 1384, 1393 (5th Cir.1983). Stated otherwise, the key question in determining a geographic market is "where does a potential buyer look for potential suppliers of the service—what is the geographical area in which the buyer has, or, in the absence of monopoly, would have, a real choice as to price and alternative services?" *United States v. Grinnell Corp.*, 384 U.S. 563, 588–89, 86 S.Ct. 1698, 1713, 16 L.Ed.2d 778 (1966). Our precedent unmistakably demonstrates that delineating geographic markets is no easy endeavor and that

some "fuzziness" may be inherent in any attempt to do so. *Philadelphia Nat'l Bank*, 374 U.S. at 360 n. 37, 83 S.Ct. at 1739 n. 37. This case is no exception.

### a. Primary Care

■ At its broadest, Columbia delineates the geographic market for primary care physician services as Warren County and five surrounding zip codes: 71282 (Tallulah, Louisiana); 39150 (Port Gibson, Mississippi); 39086 (Hermanville, Mississippi); 39144 (Pattison, Mississippi); and 39156 (Redwood, Mississippi) (Exhibit PX–419.) Columbia's expert, Dr. Eisenstadt, testified that 87% of the visits to the primary care physicians at the Vicksburg, Street and Mission Clinics (the "representative clinics") were made by patients living in this geographic area. (Trial Tr. at 2132.) Dr. Eisenstadt based this opinion on physician visit data produced by the representative clinics to which he applied a modified Elzinga–Hogarty analysis.[13] Be-

---

**13.** The Elzinga–Hogarty ("E–H") test is a well-known tool of economists that was devised by Professor Kenneth B. Elzinga of the University of Virginia and Thomas F. Hogarty, formerly professor of economics at Virginia Polytechnic Institute and State University. Kenneth G. Elzinga & Thomas F. Hogarty, *The Problem of Geographic Market Delineation in Antimerger Suits*, 18 ANTITRUST BULL. 45 (1973) [hereinafter Elzinga & Hogarty, *Market Delineation*] ; Kenneth G. Elzinga & Thomas F. Hogarty, *The Problem of Geographic Market Delineation Revisited: the Case of Coal*, 23 ANTITRUST BULL. 1 (1978) [hereinafter Elzinga & Hogarty, *Market Delineation Revisited*]. In a merger setting, the purpose of the E–H test is to analyze patterns of consumer origin and destination and then to use that information to identify geographically the relevant competitors of the merging firms. *F.T.C. v. Freeman Hosp.*, 69 F.3d 260, 264–65 (8th Cir.1995); *United States v. Rockford Memorial Corp.*, 717 F.Supp. 1251, 1266 (N.D.Ill.1989), *aff'd* 898 F.2d 1278 (7th Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). As explained by Professor Elzinga, a geographic market is an area where there are (1) relatively few imports of the product (little comes in from the outside or "LIFO"); and. (2) few exports of the product (little goes out from the inside or "LOFI"). Kenneth G. Elzinga, *Defining Geographic Market Boundaries*, 26 ANTITRUST BULL. 739, 742 (1981) [hereinafter Elzinga, *Market Boundaries*]. At trial, Dr. Eisenstadt explained in basic terms that the E–H test is a matter of looking at how many people leave an area to get services (out-

flow) and how many people come into an area to get services (inflow). (Trial Tr. at 2064–66.) Both inflow and outflow are important in determining how much prices would have to increase within that area before lost business would make the price increase unprofitable. (*Id.*)

The methodology used in performing a traditional E–H analysis entails a minimum of four steps and employs two key calculations: LIFO and LOFI (defined above). Elzinga & Hogarty, *Market Delineation I* at 73–76 (outlining four-step process for estimating market size in terms of area and volume). The analysis begins by locating the larger of the merging firms and drawing a hypothetical market area around the firm. Professors Elzinga and Hogarty initially suggested that the analysis should begin by drawing the minimum geographic area necessary to account for 75% of product shipments from the merging firm. This hypothetical area would be redrawn or adjusted throughout the analysis to reflect the results of the LIFO and LOFI calculations. *Id.* at 73–74. They subsequently ratcheted upward the initial 75% benchmark. Elzinga & Hogarty, *Market Delineation Revisited, supra*, at 2; see discussion *infra* at note 15.

To better illustrate the mechanics of the analysis, an economist studying a hospital merger would begin by drawing a hypothetical or provisional "service area" around the larger of the merging hospitals. The provisional service area would represent the economist's initial estimate of the basic area from which the merging hospital attracts its patients. *Freeman Hosp.*, 69 F.3d

cause of a lack of certain patient destination data, Dr. Eisenstadt was unable to perform a complete E–H analysis of patient inflows and outflows in the primary care and other physician markets. Specifically, Dr. Eisenstadt had data showing the area from which the representative clinics draw their patients, which permitted him to perform a LOFI measurement (defined *supra* at note 13). He could not, however, perform a LIFO measurement (defined *id.*) because none of the clinics, the State of Mississippi or any other public source keeps records that show where the residents of a specific area go for physician services. Notwithstanding the lack of patient destination data, Dr. Eisenstadt was able to express an unqualified opinion regarding the geographic market for primary care due, in part, to his experience in drawing inferences from hospital markets (for which there was complete patient flow data). (Trial Tr. at 2132–33.)

In its challenge to the proposed geographic market, Quorum's expert, Mr. Oliver, stated to the Court that the defendants were not trying to define their own version of the geographic markets for physician services; instead, they were trying to show where it was likely that patients "come from and where they travel. . . ." (*Id.* at 2706.) In

this spirit, Mr. Oliver suggested that Columbia's proposed geographic market for primary care physician services was illogical because it extended thirty-six miles west but only seventeen miles east. Mr. Oliver postulated that, if people were willing to drive thirty-six miles in one direction, they would be willing to drive the same distance in all directions. To illustrate his point, Mr. Oliver presented the Court with a collection of diagrams, which are no doubt similar to what another Judge has described as "a dizzying series of concentric circles." *Cf. Marshfield Clinic,* 65 F.3d at 1411 (Posner, J.) (equating the plaintiff's proposed market derived from concentric circles drawn around clinic offices with a hunt for the snark of delusive exactness); Exhibits DQ–612–13. In Mr. Oliver's diagram of the primary care geographic market, each circle represents an area thirty-six miles in radius that surrounds a community outside of Dr. Eisenstadt's proposed geographic market where, nonetheless, a family practitioner or internist practices.

Because it is not supported by record evidence, the Court rejects Mr. Oliver's theory that patients are just as likely to drive a certain distance in one direction as in any other direction [14] and therefore finds that Quorum's concentric circle illustrations lack

---

at 264. In order to pinpoint where patients reside, the economist would compile a record of patient zip codes from the hospitals' patient discharge data. Using patient zip codes, the economist could then study the patients who reside within the provisional service area to determine where those patients go for hospital services. If it is discovered that the patients who live within an area use hospitals outside of that area, the economist has a basis for concluding that the outlying hospitals will act as a check on the exercise of market power by the merging hospitals. *Id.* at 264–65 & n. 9; *Rockford,* 717 F.Supp. at 1266.

Once satisfied with the hypothetical LIFO market, the economist would use zip code data to perform a LOFI measurement of the percentage of hospital patients who reside within the service area. This calculation assists the economist in determining whether a significant number of "immigrating patients" (i.e., patients who reside outside of the service area) travel into the service area for hospital care. If a large number of immigrating patients use hospitals located within the service area, the economist may conclude that outlying hospitals located nearer to the immigrating patients' residences could act as a check on the exercise of market power by the

service area hospitals. *Rockford,* 717 F.Supp. at 1266.

In essence, LOFI measures patient immigration into the service area (or "inflow" in Dr. Eisenstadt's terminology), and LIFO measures patient outmigration (or "outflow"). *Rockford,* 717 F.Supp. at 1266–67.

Although often used in merger studies, the E–H test is not without its critics. *E.g.,* Elzinga & Hogarty, *Market Delineation Revisited, supra,* at 1–17; Elzinga, *Market Boundaries, supra,* at 739–52 (responding to Gregory J. Werden's criticism of E–H test for, among other things, its focus on shipments data as the proper variable for estimating geographic market areas); *see also Rockford,* 717 F.Supp. at 1267 (court acknowledged general efficacy of the E–H test but criticized defendants' result-oriented application of the test).

14. Not only is there no record evidence to prove that patients willingly drive thirty-six mile distances irrespective of the direction traveled, but the theory itself defies logic. It seems much more logical to this Court that simple reasons such as highway conditions and the quality of the services available at the end of the road will effect a person's decision to drive or not to drive.

probative value in determining the geographic market for primary care services. More probative was Mr. Oliver's calculation and illustration of the area from which 90%[15] of the internal medicine and family practice visits to the Vicksburg and Street Clinics originate. (Exhibit DQ–612.) The Court notes that Mr. Oliver did not analyze data from the Mission Clinic. This analysis nonetheless resulted in a slightly larger geographic area than the one proposed by Dr. Eisenstadt and included certain communities that Dr. Eisenstadt had excluded such as Utica and Edwards, Mississippi. (Trial Tr. 2697.) Inexplicably, Quorum did not counter Dr. Eisenstadt's provisional service area with evidence of 90% of all primary care visits to the representative clinics but instead focused on just two components of primary care and two of the representative clinics. Conceivably, the geographic market based on 90% of all primary care visits (not just internal medicine and family practice) would be even larger than the market presented by Quorum. However, no party has introduced evidence that supports such a configuration, and the Court is left to choose between a proposed geographic market that corresponds to the relevant product market (i.e., primary care physician services) and one that, for no reason apparent on this record, does not. Having thoroughly reviewed the record before reaching a decision on this issue, the Court has weighed, among other things, Dr. Eisenstadt's detailed testimony regarding the rationale behind his methodology with the troublesome gaps that pepper the expert testimony offered by Quorum. On this record, the Court must choose Columbia's proposed geographic market of Warren County and the five surrounding zip codes as set forth on Exhibit PX–419.

### b. Pediatrics Submarket

 Columbia proposes a pediatrics geographic market consisting of the area where patients reside and who account for 88% of the pediatric visits to the Vicksburg and Street Clinics. (Exhibit PX–430.) Roughly, this geographic area encompasses Vicksburg and the immediately surrounding zip codes. (Trial Tr. at 2141–42.) Dr. Eisenstadt testified that Columbia's proposed geographic area for the pediatrics market was very close in size and zip code identity to that of the hospital market, which he consistently used as a reference point in drawing the provisional geographic markets. Quorum offered no alternative geographic market for pediatrics and no specific challenge to Columbia's proposal. In the absence of opposition (setting aside Quorum's general opposition to the recognition of pediatrics as a submarket), the Court accepts Columbia's proposed geographic market for pediatrics.

### c. General Surgery

Columbia proposes a general surgery geographic market consisting of the area where patients reside and who account for 82% of the general surgery visits to the Vicksburg and Street Clinics, the only clinics that offer general surgery services. (Exhibit PX–429.) Like the geographic market for pediatrics, Columbia's proposed area for general surgery encompasses Warren County and the immediately surrounding zip codes.

Quorum offers an alternative geographic market that consists of an area representing patients who comprise 90% of the general surgery visits to the Vicksburg and Street Clinics. (Exhibit DQ–614.) This area includes Warren County and approximately ten

---

**15.** The proper inclusion percentage or "cutoff point" is hotly debated among experts and generally falls, depending on the product involved, in the range of 75% (the benchmark initially endorsed by Professors Elzinga and Hogarty) to 90% (now accepted as indicating a "strong" market). *See* discussion *supra* at note 13; *Freeman Hosp.,* 69 F.3d at 264. In a physician services market, for example, this percentage is nothing more than the *economist's determination of what* portion of the patient population should be included in the service area in order to paint an accurate picture of the physicians' main patient base. It therefore defines "the degree of inclusiveness of the service area, or the degree to which the area accounts for the physicians' business." *Freeman Hosp.,* 69 F.3d at 264 n. 8. An inverse relationship thus develops: the lower the cutoff point, the higher the amount of patient business that is not included in the analysis. Despite this dichotomy, experts may favor a low cutoff point, if, for example, immigrating patients are not representative of the main patient base because they overwhelmingly seek specialized services. *Id.*

surrounding zip codes. (*Id.*) Mr. Oliver suggested that the geographic market could be even larger than this 90% area if one took into consideration the overlap among concentric circles of thirty-six and fifty-one mile radii drawn around nearby cities with general surgeons. (*Id.*; Trial Tr. at 2699–2700.)

The Court declines to adopt Mr. Oliver's concentric circle theory for the reasons explained above. *see supra* discussion at Part I.C.2.a. The Court would be inclined to accept Quorum's proposed 90% area, but the record evidence suggests that there are no general surgeons who practice in Quorum's additional outlying area (i.e., the area that exceeds Columbia's proposed 82% geographic market area). (Trial Tr. at 2141.) Ultimately, this means that, whether the Court accepts Columbia's 82% area or Quorum's 90% area, the geographic market selected will have no impact on calculating market concentration—the final element in the plaintiff's prima facie case and the last step in this analytical exercise. See market share discussion at Part I.C.3. below. Because the testimony indicates that reasonable economists differ in their choice and use of inclusion percentages, and because the Court's determination of this geographic market will have little or no effect on the calculation of postmerger market share in general surgery, the Court accords Columbia the benefit of the doubt and accepts its proposed geographic area for the general surgery market.

### d. Urology

Based on the same methodology used for the preceding geographic markets, Columbia proposes a market for urology services that includes the area where patients reside and who account for 86% of the urology visits to the Vicksburg and Street Clinics, the only clinics in Vicksburg that offer urology services. (Exhibit PX–442.) Quorum proposes an area that represents the residences of patients who account for 90% of the urology visits to the two clinics. The record indicates that no independent urologists practice in the Vicksburg area. (Exhibit DVC–395.)

Finding little material difference in the size of the 86% and 90% areas and no difference whatsoever in the ultimate market share calculations for these two proposed areas, the Court accepts Columbia's geographic market for urology services.

### e. ENT

According to the testimony and other evidence, Columbia's proposed geographic market for ENT services represents the area where patients reside and who account for 90% of the ENT patients at the Vicksburg and Street Clinics (Trial Tr. at 2141; Exhibit PX–446), while that of Quorum represents 90% of the ENT visits to only one physician, Dr. Windham of the Street Clinic. (Trial Tr. at 2701; Exhibit DQ–611.) Finding little material difference in the size of the two proposed markets, the Court accepts Columbia's geographic market for ENT services.

### f. Acute Inpatient Hospital Services

■ Columbia claims that the proposed geographic market for acute inpatient hospital services is Warren County, a portion of Madison Parish in Louisiana, and a portion of Claiborne County in Mississippi. (Trial Tr. at 2059; Exhibit PX–428; see Exhibit PX–411 for zip codes comprising the provisional geographic market.) In addition to the VMC and ParkView hospital complexes, Columbia's proposed area contains two smaller hospitals: Claiborne County Hospital and Madison Parish Hospital. Dr. Eisenstadt testified that the four hospitals located within this provisional area exhibited a 17% inflow rate and an 18% outflow rate. The expert further explained that these inflow/outflow rates indicated that 17% of the patient discharges from the provisional area hospitals were comprised of patients living outside of the provisional area (i.e., the inflow rate) and 18% of patients living within the provisional area were discharged from hospitals other than the four hospitals located within the provisional area (i.e., the outflow rate). (Trial Tr. at 2077.) According to Dr. Eisenstadt, under a traditional E–H analysis of homogeneous products such as coal,[16] inflow and outflow rates

---

16. In addition to coal, examples of homogeneous products would include commodities such as crude, oil, steel and cement. *Callaway Mills Co. v. F.T.C.*, 362 F.2d 435, 444 (5th Cir.1966).

of 10% or less would be considered to indicate a strong market. (*Id.* at 2074.) He added, however, that with differentiated products such as hospital services, inflow and outflow rates in excess of 10% were, in his experience, routine. (*Id.* at 2074–75.)

Quorum proposes an initial hospital services geographic market comprised of the area where 90% of VMC's and ParkView's patients live. (*Id.* at 2765–66; Exhibit DQ–616.) Mr. Oliver testified that his proposed area was based on an analysis of patient inflow to the two hospitals, but he had not taken into consideration patient outflow. (Trial Tr. at 2766.) In drawing the proposed area, Mr. Oliver did not consider patient inflow or outflow with respect to any outlying hospitals such as those in Claiborne County or Madison Parish. (*Id.* at 2765–66.) Mr. Oliver did suggest, generally, that a number of hospitals, clinics and health centers within seventy-five miles of Vicksburg exert competitive influences on ParkView, which would argue in favor of a more expansive geographic market. (*Id.* at 2720–25; Exhibit DQ–620.)

Mr. Oliver also analyzed patient origination data for the Jackson hospitals and placed particular emphasis in his testimony on the results of his review of patient data from the Methodist Medical Center ("Methodist") in Jackson. (Trial Tr. at 2716–20; Exhibits DQ–617–18.) Significantly, the record indicates that Methodist is located approximately twenty-nine miles from downtown Vicksburg and about fifteen miles from the Warren County line. (Trial Tr. at 932–33.) In order to extract the effect of patient outmigration to Jackson for tertiary services

that are not offered in Vicksburg (and which are not included in the acute inpatient hospital services market as defined in this case), Mr. Oliver isolated and studied only the hospital procedures that are performed by both the Vicksburg and Jackson hospitals. He concluded that Methodist was drawing patients from Vicksburg for procedures that were available at the Vicksburg hospitals.[17] (*Id.* at 2719.) Comparing the area from which the Vicksburg hospitals draw 90% of their patients with the area from which the six major Jackson hospitals draw 90% of their patients, Mr. Oliver noted a "significant overlap" and concluded that Jackson is in the same geographic hospital market as Vicksburg. (*Id.* at 2720.)

Having listened to and reread the testimony and cross-examination examination of the two experts, and having reviewed the exhibits in evidence that they prepared, the Court is persuaded that the methodology employed by Columbia's expert is thorough and, as between the two alternatives, the more reliable on this issue. *See F.T.C. v. Freeman Hosp.*, 69 F.3d 260, 269 n. 13 (8th Cir.1995) ("[D]istrict court has the discretion to evaluate the credibility of expert witnesses and accept the testimony it finds most plausible."). This is not to say that Columbia's provisional market for this product is free from flaws. One defect that Quorum notes is Columbia's failure to include in its geographic market the sites where consumers of acute care inpatient hospital services could practicably turn for alternative sources of the product should the merger be consummated. *Id.* at 268.[18] Sensitive to the fact of Method-

---

In contrast, differentiated products are commonly associated with service sectors such as commercial banking or health care. A merger of differentiated product markets is said to occur when the products of the merging firms are close but not perfect substitutes. ANTITRUST ADVISER § 3.23 (Irving Scher ed.1995). Because the entire notion of market share in the economist's competition model rests on the premise that all competing firms produce identical products, product differentiation presents an added wrinkle in estimating the anticompetitive consequences of a merger. HERBERT HOVEN-KAMP, ECONOMICS AND FEDERAL ANTITRUST LAW § 11.6 (1985).

**17.** However, only three of the zip codes included in Mr. Oliver's 90% provisional hospital market for the Vicksburg area overlap with the relevant Methodist zip codes. (Exhibits DQ–616–17.) According to Mr. Oliver's analysis, the overlap (zip codes 39066, 39180 and 39194) accounts for just 3.33% of Methodist's patients who receive the shared procedures.

**18.** The Eighth Circuit in *Freeman Hospital* found that the FTC's prima facie case contained a fatal flaw because the agency failed "to present evidence addressing the critical issue of where consumers of acute care inpatient hospital services could practicably turn for alternative sources of

ist's close proximity to the Warren County line and the range of services offered at that hospital, the Court has carefully weighed the validity of including Methodist (as well as the other Jackson area hospitals) within the hospital services geographic market in this case. It is fair to say that the evidence falls on both sides of the fence and pits a wealth of testimony regarding patient preferences for local hospitalization against the testimony of several Vicksburg physicians who claim that they are competing with and losing patients to the Jackson hospitals. Although one could easily conclude from this record that Jackson hospitals should be included in defining a geographic market for tertiary hospital services that are not offered in Vicksburg (such as cardiovascular surgery, neonatal intensive care and pediatric oncology), the same conclusion is not so apparent for primary and secondary services that are currently available at the Vicksburg hospitals. Considering the totality of the evidence (including the E–H analyses and other expert testimony and the testimony of market participants with respect to consumer habits, preferences, travel impairments, employment demands and managed care considerations), it is this Court's opinion that Vicksburg and the surrounding areas as identified by Columbia represent a viable, stand-alone geographic market for acute inpatient hospital services that is economically distinct from the Jackson market.

### 3. Probable Anticompetitive Impact

Once the relevant markets are defined, the plaintiff's final hurdle in presenting its Section 7 prima facie case is establishing probable anticompetitive impact within the relevant markets. *Domed Stadium,* 732 F.2d at

the product should the ... merger be consummated and ... prices become anticompetitive." *Freeman Hosp.,* 69 F.3d at 268. The Court notes that, unlike the plaintiff in *Freeman Hospital,* Columbia addressed the issue of alternative sources at various times throughout this trial. (*E.g.,* Trial Tr. at 103–04, 903, 1145–48; Exhibits PX–448–49.) The issue of alternative sources is further discussed at Part I.C.3.b.4. below.

19. The 70% figure represents market share calculated by office visits in the primary care geographic market that the Court accepted in Part I.C.2.a. above. That geographic market roughly

491. In a horizontal merger situation, there are two basic methods that a plaintiff can employ to meet its burden of proof: (1) demonstrate that the size of the merging entities "makes them inherently suspect in light of Congress' design to prevent undue [economic] concentration," resulting in a significant increase in market share and an undue market concentration; and (2) in cases where size is not inherently suspect, show that other characteristics of the market make the merger more economically harmful than the bare market share and market concentration statistics would otherwise indicate. *Id.* With respect to the physician services markets, Columbia relies on the first method and offers postmerger market share calculations to prove its case. However, because Columbia has alleged vertical injury in the acute inpatient care hospital services market, market share calculations are inapplicable to that claim. *See supra* discussion at note 4. Columbia's proof of probable anticompetitive effect in that market must therefore be considered in the light of other structural consequences. *Brown Shoe,* 370 U.S. at 324, 82 S.Ct. at 1523.

### a. Market Concentration in the Physician Markets

■■■ Regarding the physician markets, Columbia's expert testified that, based on office visit data, the River Region Clinic would have the following postmerger market shares in the geographic markets heretofore accepted by the Court:

(i) 70% for primary care physician services; [19]

(ii) 100% for pediatric services;

(iii) 100% for general surgery services;

consists of Warren County, Tallulah, Port Gibson, Hermanville, Pattison and Redwood. (Exhibit PX–419.) If the market were comprised solely of Warren County, Columbia claims that the market share based on office visits would rise to 92%. (Plaintiff's Proposed Findings of Fact and Conclusions of Law at ¶ 95.)

Columbia concedes in its briefs that, if postmerger market share for primary care physician services is calculated by total primary care physician headcount rather than by patient office visits, the market share drops to 55% in the geographic market that the Court has accepted. (*Id.* at n. 10.)

(iv) 100% for urology services; and

(v) 67% (based on physician headcount) for ENT services.

(Trial Tr. at 2149–53; Exhibits PX–420–23.)

Quorum offers little or no direct attack on Columbia's calculation of these market shares. Like the defendants in *Butterworth*, Quorum apparently concedes that the merger will result in high market concentrations. *Butterworth Health Corp.*, 946 F.Supp. 1285, 1294 (defendants offered no contest to expert testimony regarding market concentrations of 47% to 65% in general acute care inpatient hospital services market; court concluded that the FTC established its Section 7 prima facie case).

Based on this record, the Court accepts Columbia's calculation of the market share percentages, except for the pediatric services submarket and, as discussed in Part I.C.3.b.4. below, the primary care market. The record clearly indicates that less than 100% of the physicians practicing pediatric medicine within the geographic market accepted by the Court will be affiliated with the River Region Clinic. For example, Dr. Sessums of the Mission Clinic testified on cross-examination that he personally devotes approximately 20% of his practice to pediatric care and that one of his partners, Dr. Giffin, devotes an even larger amount of time to pediatric patients. (Trial Tr. at 131–34.) Dr. Sessums further testified under cross-examination that other physicians at the Mission clinic provide pediatric care, that his partners are qualified to take care of infants and children and, correcting a statement made in his direct testimony, that the River Region Clinic would not possess a 100% market share in pediatrics. (*Id.* at 132–34.) The evidence shows that of the five physicians currently associated with the Mission Clinic, four of these doctors are engaged in full-time practices. (Exhibits DVC–395, PX–454–55; Trial Tr. at 92–93.) However, with the possible exception of Dr. Sessums, there is no evidence in the record that would permit this Court to calculate the practice time that each of these physicians devotes to pediatric services.

In addition, the record contains solid evidence that Columbia has recruited and signed an employment contract with an internal medicine/pediatrician, Dr. Steven W. Venters, who is committed to begin work at the Mission Clinic in August 1997. (Trial Tr. at 177, 1709, 1865–67, Exhibit DQ–153.) On this record, Dr. Venters's contractual commitment and imminent arrival in Vicksburg (conceivably before the resolution of this litigation) can neither be dismissed nor discounted by this Court in its assessment of the postmerger pediatrics market. *Marshfield Clinic*, 65 F.3d at 1411 (physicians may be part of a market even if not presently active in it); *see also* 1992 DOJ and FTC Horizontal Merger Guidelines § 3.2 n. 27, *reprinted in* PRIMARY SOURCE, *supra* note 4 ("Firms which have committed to entering the market prior to the merger generally will be included in the measurement of the market."). However, there is no evidence that indicates how much time Dr. Venters will devote to pediatric services, and the Court is therefore at a loss in assessing his impact on the postmerger market.

In presenting its market share evidence, Columbia has failed to take into account, in any manner whatsoever, the Mission Clinic physicians or any independent physicians who provide pediatric services in the Vicksburg area or who are qualified to do so. On this record, an accurate calculation of the River Region Clinic's postmerger pediatrics market share is impossible. Weighing the evidence that four, and soon to be five, Mission Clinic physicians practice some unknown quantum of pediatric medicine against the evidence of five practicing pediatricians at the River Region Clinic, the Court is left with nothing more than an uncertain, but undeniably overstated, presentation of market concentration. The Court therefore holds that Columbia has failed, on this record, to bear its burden of proving probable anticompetitive effects in the pediatrics submarket.[20]

---

20. The Court observes that, even if Columbia had been able to prove undue market concentration in the pediatrics submarket, its recent and successful recruitment of Dr. Venters, a pediatrician and internist, would seriously undercut any claim that significant barriers to entry exist in

### b. Other Relevant Factors in the Physician Markets

▮ Appellate courts have held that a district court acts within its discretion in determining that evidence of a high market share establishes a prima facie antitrust violation, which shifts the burden of rebuttal to the defendant. *United States v. Syufy Enter.*, 903 F.2d 659, 664 n. 6 (9th Cir.1990); *see also Rockford*, 898 F.2d at 1285 (defendants' immense shares in a reasonably defined market create a presumption of illegality); *F.T.C. v. University Health, Inc.*, 938 F.2d 1206, 1218-19 & n. 25 (11th Cir.1991)(if government makes its showing, presumption of illegality arises) The law is clear, nonetheless, that evidence of high market share does not require a district court to conclude that there is an antitrust violation. *Syufy*, 903 F.2d at 664 n. 6; *United States v. Mercy Health Servs.*, 902 F.Supp. 968, 976 (N.D.Iowa 1995) (market share statistics are not conclusive indicators of anticompetitive effects).

At first blush, the market share percentages in this case, which range from 67% to 100%, are staggering. However, lest the Court's vision of the forest should become obstructed by some very tall statistical trees, a closer look at the human component behind each relevant market appears appropriate.

### 1. Urology

▮ Starting with urology, which displays a 100% postmerger market share, the evidence shows that the entire market is comprised of only two urologists, Drs. Fagan and Humble. (Exhibit PX–454.) After the merger, both urologists plan to practice together at the River Region Clinic. Although Columbia urges this Court to find the merger presumptively unlawful on the basis of this 100% postmerger market share in urology, the evidence contains practical, commonsense reasons that justify a combined practice between these two doctors. According to the testimony of physician witnesses, the key issue for doctors is back-up or physician coverage. Dr. Fagan testified that coverage is a serious concern for physicians who want to take a vacation or a weekend off. (Trial Tr. at 986.) Dr. Fagan's testimony was echoed by Drs. Hopson ("Everyone likes call coverage.") and Sessums ("Generally physicians now that come out of residency desire to be with a group to provide coverage where you can have some off time."). (*Id.* at 126, 2574.) Considering the specific character of this two-person market that exists within a relatively small medical community, this Court finds it inconceivable that Congress intended the Clayton Act to prohibit two urologists in Vicksburg, Mississippi from practicing together under the same roof. The practical effect of such an impractical statutory interpretation could be to deprive two physicians from taking alternate weekends off or an occasional family vacation. With the real-life implications of this alleged antitrust violation in mind, it appears to this Court that, if there is any arguable monopoly here at all, it is a "natural monopoly." *Marshfield Clinic*, 65 F.3d at 1412 (clinic employing all twelve physicians in a county might be considered a "natural monopolist"—a firm that has no competitors simply because the market is too small to support more than a single firm).[21]

the pediatrics market. *United States v. Syufy Enter.*, 903 F.2d 659, 664 (9th Cir.1990)(a high market share will not raise an inference of monopoly power in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors).

**21.** Natural monopolies have been described as occurring when, "because of the high ratio of fixed costs to variable costs, a single firm has declining average costs at the level of demand in the industry, such that the single firm can supply the service more cheaply than two firms could." *United Distribution Cos. v. F.E.R.C.*, 88 F.3d 1105, 1122 n. 4 (D.C.Cir.1996) (citing RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW § 12.1, at 343–45 (4th ed.1992)). One court has offered a shorthand definition: "a natural monopoly is a market that can practically accommodate only one competitor." *Nat'l Reporting Co. v. Alderson Reporting Co., Inc.*, 763 F.2d 1020, 1023–24 (8th Cir.1985).

For example, a small town may not be able to support more than one movie house. 3 PHILLIP AREEDA & DONALD R. TURNER, ANTITRUST LAW ¶ 621 (1978). In such a case, demand is too thin and monopoly is inevitable. *Id.* Where the character of the market makes monopoly inevitable, commentators have observed that it would be futile and a waste of judicial resources to hold such a monopoly unlawful. *Id.*

The Court cannot overemphasize the fact that the urology services market now under consideration is the relevant market exactly as it was proposed, defined and presented by Columbia. The Court further observes that Columbia's market study for VMC (entitled "Strategic Review FY '96") contains data showing that only 2.77 urologists are needed in a community of 90,000. (Exhibit DQ–121, p. HCA9679.) This same market study provides an estimated 1993 population of 29,100 for Vicksburg and 50,871 for Warren County. (*Id.* at p. HCA9620.) William Patterson of Columbia testified that he knew the current population of Vicksburg to be around 30,000 and that of Warren County to be in the range of 49,000 to 50,000. (Trial Tr. at 1992.) Dr. Sessums testified similarly that the approximate population of Vicksburg is 28,000 within the corporate city limits and 48,000 for Warren County. (*Id.* at 85.) It simply defies logic to imagine that federal law requires this Court to enjoin two urologists from working together in a market so small that it might only support two full-time urologists. As Judge Posner explained in *Marshfield Clinic* when analyzing a medical community "too small to support more than a handful of physicians":

> If an entire county has only 12 physicians, one can hardly expect or want them to set up in competition with each other. We live in the age of technology and specialization in medical services. *Physicians practice in groups. in alliances. in networks, utilizing expensive equipment and support.* Twelve physicians competing in a county would be competing to provide horse-and-buggy medicine.

*Marshfield Clinic,* 65 F.3d at 1412 (emphasis added).

Having listened to fourteen days of trial testimony and arguments of counsel, having thoroughly reviewed the trial transcript and the evidence produced at trial, and finding no evidence on this record of improper exclusion of competitors from the urology services market or any other sign of unlawful monopoly power, the Court concludes that Columbia has failed to prove a Section 7 violation in the urology market.

### 2. General Surgery

■■■ As with urology, Columbia has demonstrated a 100% market share in general surgery. The evidence shows that only five general surgeons practice in Vicksburg. After the merger, these five surgeons plan to practice as a group at the River Region Clinic. Columbia's "Strategic Review FY '96" (Exhibit DQ–121) contains data indicating that a total of 8.79 general surgeons are needed for a population of 90,000. (*Id.* at p. HCA9679.) There is no record evidence whatsoever to suggest that anyone has attempted to exclude competitors from entering the general surgery market as defined in this case.

Just as the court in *Marshfield Clinic* found no reason under the antitrust laws to force the twelve physicians in that market to compete with each other, this Court must reach the same result in this small market of only five general surgeons. Once again, the Court is reminded that the narrow general surgery market now under consideration is precisely the market that Columbia proposed and presented to this Court.

Even if the general surgery market in this case were not viewed as a natural monopoly, the evidence proves that substantial competitive forces from Jackson and encroaching surgical centers will restrain any potential that these five Vicksburg surgeons might have to exercise postmerger market power. The Court was impressed by the trial testimony of two general surgeons, Dr. W. Briggs Hopson of ParkView and Dr. Hendrik Kuiper of the Vicksburg Clinic, who are part of the relevant market. Both surgeons testified emphatically that, in the field of surgery, the Jackson surgical community presents very serious competition for the Vicksburg surgeons.[22] Dr. Hopson explained in detail how

---

Natural monopolies do not run afoul of the antitrust laws so long as the monopoly in question acquired and maintained its position by business acumen, superior quality or other honest means and did not exclude competitors improperly. *Nat'l Reporting,* 763 F.2d at 1023–24; *see also Marshfield Clinic,* 65 F.3d at 1412–13.

**22.** For example, excerpted from Dr. Kuiper's cross-examination testimony is the following:

he has lost vascular surgery patients to competition from the Jackson medical community. (Trial Tr. at 2501–02.) Dr. Hopson attributed much of his lost surgical business to the fact that he must refer patients to Jackson for procedures such as arteriograms that are not available in Vicksburg. Once in Jackson, many of these patients stay in the state capital for vascular surgery. (*Id.*) Dr. Hopson testified unequivocally that referrals to Jackson for services that are not available in Vicksburg have a significant adverse effect on his practice area. (*Id.*)

The evidence further demonstrates that Jackson hospitals are becoming more and more visible to the Vicksburg community through alliances such as the West Mississippi Heart Network, an affiliation between Methodist and VMC. (*Id.* at 2400.) In addition, Jackson hospitals and surgeons are exerting their presence in the Vicksburg surgical market by proposing the development of satellite clinics in Vicksburg. See Exhibit DQ–528 (letter from Director of Business Development, Methodist Medical Center, discussing development of satellite clinic in Vicksburg by Methodist neurosurgeons).

Based on the testimony of the Vicksburg surgeons and on other record evidence, the Court finds as a fact that the Jackson medical community is a restraining competitive force on the general surgery market as defined in this case. This is exactly the type of competitive check, which operates outside of the defined geographic market area (and, in this case, is encroaching into the geographic market area via outreach programs and satellite clinics), that economists and courts recognize as a restraint on the merging firms' exercise of market power. *E.g., Freeman Hosp.*, 69 F.3d at 264 n. 9; *see* Trial Tr. at 2724–25 (expert testimony of Mr. Oliver explaining significance of outlying competitive forces); *see also* discussion *supra* at note 13. On the record before this Court, there is no credible evidence to prove that the five Vicksburg surgeons in this market could exclude, in any realistic manner, the ever-increasing competition from Jackson's sophisti-

cated surgical market. The ability of the Vicksburg surgeons to achieve such a feat is highly unlikely. Therefore, finding no evidence of power to exclude the Jackson competition, the Court concludes that Columbia has failed to prove a Section 7 violation in the general surgery market. *See Syufy*, 903 F.2d at 671 & n. 21.

**3. ENT**

■ By physician headcount, the ENT market in this case exceeds the urology market by only one physician. Of the three ENTs who practice in Vicksburg, one is a well-respected, established independent physician, Dr. Chester W. Masterson. (Trial Tr. at 1008.) Dr. Masterson was often referred to during this litigation as "Dr. Masterson Sr." because his son practices medicine with the Mission Clinic. It is assumed that the remaining two ENT specialists, Drs. Windham and Bradfield, will practice together at the River Region Clinic, thereby creating a 67% market share for River Region in this three-physician market. The evidence indicates that Columbia recently assisted in the recruitment of Dr. Bradfield to The Vicksburg Clinic. (*Id.* at 1588–89.) The record fails to establish whether Dr. Bradfield is successfully integrated into the Vicksburg medical community or whether he has any long-term commitment to remaining in Vicksburg after the expiration of his one-year contract with Columbia. (*E.g., id.* at 2658–59.)

Columbia's own market study materials indicate that a population of 90,000 needs 2.75 ENTs. (Exhibit DQ–121, p. HCA9679.) Once again, the Court is faced with an extremely small physician market. However, unlike the urology and general surgery markets, the handful of ENTs comprising this market do not all practice at the same "firm" and therefore cannot be characterized structurally as a natural monopoly. Arguably, Columbia has made its prima facie showing in the ENT market based on the 67% post-merger market share. Nonetheless, the Court finds that a competitive balance exists

... That's the whole point I'm trying to make. And as a clinician I've understood for years we are in competition with Jackson, absolutely.

(Trial Tr. at 3074–75.)

in this market by virtue of the fact that the independent ENT, Dr. Masterson, Sr., is a well-established Vicksburg physician and represents by himself 33% of the entire ENT market. Weighing the competitive force of Dr. Masterson, Sr., against the combination of Dr. Bradfield's immature practice and that of Dr. Windham, this Court cannot conclude that, after the merger, Drs. Bradfield and Windham will be capable of wielding the market power necessary to set prices or exclude or lessen competition in any substantial manner. *Syufy*, 903 F.2d at 671 & n. 21; *University Health*, 938 F.2d at 1220–21 (acquired firm's weakness is one of many factors that a defendant may introduce to undermine predictive value of market share statistics); *Mercy Health*, 902 F.Supp. at 976 (in analyzing the accuracy of market share statistics to predict postmerger anticompetitive effects, one of the factors that courts consider is the continuation of active price competition). Accordingly, Columbia has failed to carry its ultimate burden of persuasion in the ENT market.

### 4. Primary Care

■ By Vicksburg standards, the primary care market exhibits a critical mass that is not present in the other physician markets. Throughout this litigation, the parties have debated the actual physician headcount within this market. To clarify the now blurred borders between who's in and who's out, the Court finds that the River Region Clinic can be expected to have a total of twenty-one primary care physicians, which are broken down as follows: eight family practitioners, eight internists and five pediatricians. (*Accord* Plaintiff's Response to Defs.' Proposed Findings of Fact at 7–8).[23]

Quorum has introduced rebuttal evidence of fifteen primary care physicians who practice within the geographic area accepted by the Court. According to Quorum, these physicians are available as substitutes for the River Region doctors (or will be available imminently in the case of Dr. Venters). Quorum's list of substitute primary care physicians is comprised of five practitioners at the Mission Clinic, one at VMC, four in Port Gibson, Mississippi, and five in Tallulah, Louisiana.[24] Based on a post-merger physician headcount of 21 primary care physicians at the River Region Clinic and 15 physicians who will practice elsewhere within the geographic area, the Court calculates a primary care market share of 58.33% at the River Region Clinic and 41.67% practicing independently or with other clinics.

Arguing that the primary care physicians in Port Gibson and Tallulah are not acceptable substitutes for the River Region doctors, Columbia urges this Court to discount the presence of these nine physicians who currently practice within the relevant geographic market and to refrain from including them in any market share calculations. To support its position, Columbia relies on the expert testimony of Dr. Eisenstadt (Trial Tr. at 2134–39) and on consumer testimony regarding a general preference, based largely on proximity, for Vicksburg physicians. (*E.g., id.* at 1148.) At trial, Dr. Eisenstadt offered the only qualitative criticism of the Tallulah and Port Gibson primary care physicians. Columbia's expert opined that "the practice capabilities of some of the outlying primary care physicians in Tallulah and Port Gibson *may* be limited." (*Id.* at 2137, emphasis

---

23. By name, the primary care physicians included in this tally are: family practitioners Abraham, Barnes, Butler, Easterling, Ford, Johnston, McMillan and Stanley; internists Bouldin, Edney, Habeeb, Low, Pierce, Ross, Tribble and Williams; and pediatricians Roy, Sluis, Smith, Weiland and Weller. (Plaintiff's Response to Defs.' Proposed Findings of Fact at 7–8; Exhibit P–455.) Although the Court has found that Columbia failed to carry its burden of proof in the pediatrics submarket, the Court will nonetheless include pediatricians in its headcount of primary care physicians.

24. The physician headcount at the Mission Clinic includes Drs. Chiarito, Giffin, Masterson, Sessums and, for the reasons given in Part I.C.3.a. above, Venters. Because the evidence indicated that Dr. Burford's partners have no expectation that she will return to practice, the Court has not included her in the physician headcount. (Trial Tr. at 93.)

The remaining nine substitute primary care physicians according to Quorum are: in Port Gibson, Drs. Headley, Barnes, Marshall and Amork; and, in Tallulah, Drs. Newman, Newman, Shenier, Polquitt and Perry. (Exhibit DVC–395.)

added.)[25] Although Dr. Eisenstadt conceded that residents from Tallulah and Port Gibson could possibly use primary care physicians in Vicksburg, he maintained that the reverse was not true. (*Id.* at 2139; Eisenstadt testifying that "People who live in Vicksburg would not *want* to be directed to a primary care doctor in Tallulah or Port Gibson." (emphasis added)). Dr. Eisenstadt further testified that he had uncovered no evidence to indicate that Vicksburg residents travel to outlying areas for primary care.

The Court finds that Columbia has missed the point. Present consumer preferences are not dispositive in determining whether viable alternatives exist in any given market. *Freeman Hosp.*, 69 F.3d at 271. The key inquiry must focus upon where consumers can practicably go for primary care services after the merger, not where consumers have been going, or where they would prefer to go. *Id.* at 268–71. With this principle in mind, it appears to this Court that the market share percentage espoused by Columbia, which is based on last year's office visits to only three Vicksburg clinics, falls into the fallacy of overemphasizing where consumers have gone in the past. Columbia's calculation of a 70% market share (which results in a number that far exceeds a market share calculation based on physician headcount) neglects the presence of qualified primary care physicians who are located within the geographic market area and are available to provide services to consumers. The Court therefore finds that a market share calculation based on the primary care physician headcount (i.e., 58.33%) is the more useful tool in this case for analyzing the probability of postmerger anticompetitive effects. This conclusion is buttressed by the fact that the record contains no formal evidence of qualitatively inferior or unacceptable services being offered by primary care physicians in Port Gibson and Tallulah.

The Court is unaware of any prior case law that has addressed the issue of what market share percentage, in the context of a clinic merger, is necessary to create a presumption of illegality.[26] Columbia argues that, by

---

**25.** Dr. Eisenstadt's supposition about Tallulah's and Port Gibson's limited primary care services is not corroborated by any specific record evidence, and the Court therefore views it as conjecture. *See Freeman Hosp.*, 69 F.3d at 270–71 (district court did not err in refusing to credit plaintiff's testimony regarding limited quality and range of services in outlying hospitals where record lacked sufficient data and contained no formal analysis in support of such assertions). The Court found more creditworthy the testimony of Charles Pitts, CEO of United Health, who indicated that his company would have no qualitative problem with including physicians in outlying towns on its managed care panel; his only concern was proximity to Vicksburg. (Trial Tr. at 282.) Similarly, Rissa Richardson, another managed care witness, voiced no qualitative opposition to the primary care physicians in Port Gibson and Tallulah. Richardson noted that, if the Warren County Medicaid pilot project begins operations, participating Medicaid patients would be required to visit primary care physicians located within thirty minutes average travel time from the patient's residence. There is no reliable data in the record to prove that any potential Medicaid patient would be foreclosed from visiting a Port Gibson or Tallulah physician because of distance or travel time.

**26.** Antitrust case law exhibits a long-drawn-out battle over what percentage share of a given market is sufficient to demonstrate market power. *E.g., Fineman v. Armstrong World Indus.. Inc.,* 980 F.2d 171, 201–02 (3d Cir.1992) (a plaintiff must show a "significantly larger" market share than 55% to establish a prima facie case of market power), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *White Bag Co. v. Internat'l Paper Co.,* 579 F.2d 1384, 1387 (4th Cir.1974) (defendant must control at least 70% of the relevant market to be subject to a monopolization charge); *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir.1945) ("[Over 90%] is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent [60 or 64%] would be enough; and certainly thirty-three percent [33%] is not."). Understandably, the Supreme Court has never defined "undue percentage share" in terms of a hard and fast numerical threshold. *Philadelphia Nat'l Bank,* 374 U.S. at 363, 83 S.Ct. at 1741 (merger that produces a firm controlling an "undue percentage share" of the relevant market, and results in a significant increase in the concentration of firms in that market, is inherently likely to lessen competition substantially); *see* ANTITRUST ADVISER § 3.21 (Irving Scher ed.1995). Notably, since the Supreme Court rendered its decision in *United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), the emphasis in Section 7 merger cases has been to analyze carefully the likely harm to consumers, instead of accepting a firm's postmerger market share as conclusive proof of its market power. *United States v. Baker Hughes Inc.,* 908 F.2d 981, 990–91 & n. 12 (D.C.Cir.1990).

analogy to hospital merger cases, the excessively high postmerger market shares in this case make the merger presumptively unlawful on the basis of any single market. *See University Health*, 938 F.2d at 1219 (in hospital merger, 43% market share of inpatient acute care hospital services market established FTC's prima facie case; this conclusion was appropriate in light of Georgia's certificate of need law that regulated hospital expansions and raised substantial entry barriers for new competitors); *Rockford*, 898 F.2d at 1283–85 (64–72% share of inpatient acute care hospital services market created presumption of illegality in hospital merger). The Court finds, however, that the hospital merger cases are not wholly applicable to the primary care market now under consideration because of the very point emphasized by the court in *University Health*, i.e., barriers to entry. Unlike hospitals, primary care physicians who seek to establish a new practice are not required to demonstrate, to the satisfaction of state regulators, that there exists a public need for their services. *University Health*, 938 F.2d at 1219–20. As discussed in detail below, the Court finds that the totality of the evidence in this case demonstrates low entry barriers to the primary care market.

Courts and commentators have defined barriers to entry as "either 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter

entry while permitting incumbent firms to earn monopoly returns.'" *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir.1993) (quoting AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 409 (1992 Supp.)), *cert. denied*, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). This record contains no evidence whatsoever of new primary care physicians incurring longterm costs that were not incurred by already-established physicians. Cf. *Morgan, Strand, Wheeler & Biggs v. Radiology Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991) (cost of equipping a physician's office was not significant entry barrier where evidence did not permit comparison of that cost to potential competitors' resources or expected returns). Moreover, the Court is not persuaded by Columbia's attempts to prove that factors indigenous to the Vicksburg market act as a deterrent to new primary care entrants. Among other things, Dr. Eisenstadt expressed his opinion that a timely, likely and sufficient[27] entry of new physicians into the Vicksburg market would be unlikely because physician demand in the area is "relatively flat" and there is no need for additional primary care physicians in Vicksburg. (Trial Tr. at 2171, 2486.) The Court finds that this opinion is contrary to the greater weight of the testimonial and documentary evidence, which points to a need for additional physicians in this field.

The margin for growth in the primary care market is apparent in Columbia's "Strategic Review FY '96." (Exhibit DQ–121.) This

---

**27.** The "timely-likely-sufficient" standard has its origins in the Department of Justice and Federal Trade Commission Horizontal Merger Guidelines (the "Guidelines"). 1992 DOJ and FTC Horizontal Merger Guidelines § 3, *reprinted in* PRIMARY SOURCE, *supra* note 4. It is important to note that the Guidelines are not binding on the courts or the agencies. *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1300 (9th Cir.1993), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994).

At the heart of this standard is the theory that a "merger is not likely to create or enhance market power or to facilitate its exercise, if entry into the market is so *easy* that market participants, after the merger, either collectively or unilaterally could not profitably maintain a price increase above premerger levels." Guidelines § 3.0 (emphasis added) "Easy" entry is evaluated under the Guidelines by applying the timely-likely-sufficient standard. *Id.* Essentially, to be "timely," the new entrant must be able to enter

the market and achieve a significant market impact within two years of the merger. *Id.* at § 3.2. To be "likely," the entry must be profitable at premerger prices, and the new entrant must be able to obtain those prices. *Id.* at § 3.3. The final and strikingly circular step in the analysis states that an entry or multiple entries will be "sufficient" to deter or counteract anticompetitive postmerger effects whenever such entry passes muster under the "likely" test in section 3.3 of the Guidelines. *Id.* at § 3.4.

Although both expert witnesses acknowledged the propriety of using the timely-likely-sufficient standard to evaluate market entry, they reached polar opposite conclusions regarding the existence of significant barriers to entry. Not surprisingly, Dr. Eisenstadt concluded that entry barriers were significant, but Mr. Oliver concluded that they were not. (*Compare* Trial Tr. at 2168, 2171 *with id.* at 2626–27, 2849.)

report contains data demonstrating that a population of 90,000 needs 21.71 general and family practitioners, 20.94 internists and 9.79 pediatricians. (*Id.* at p. HCA9679.) Taking into consideration the current physician headcount discussed above, Columbia's own market analysis suggests that the primary care market has not reached saturation. This conclusion was confirmed by Quorum's expert, Mr. Oliver, who testified that the Vicksburg area is underserved in the field of primary care and that the market has not reached the point of saturation. (Trial Tr. at 2680–81.) Dr. Fagan of the Vicksburg Clinic testified that the clinic needs more primary care physicians. (*Id.* at 1041.) In addition, the Court found credible on this point the trial testimony of Columbia executive William Patterson, who stated that "[p]rimary care is in strong demand." (*Id.* at 1657.)

The high demand for primary care and the opportunity for growth in Vicksburg is further evidenced by the abundant testimonial and documentary proof of Columbia's own pursuit of physician recruitment, including Columbia's investment in the recruitment of primary care physicians through its medical service organization, VIP, Inc. (*E.g.,* Exhibit DQ–121, p. HCA9602; Trial Tr. at 1582, 1586–90.) On this score, the Court was impressed by William Patterson's testimony regarding general opportunities for new physicians in the Vicksburg market. (Trial Tr. at 1589–90.) Although this testimony was given in response to a question about the recruitment of specialists (which is arguably a more difficult task than primary care recruitment because of a smaller patient base and the need to generate that base through referrals from primary care physicians), Patterson's general observations about entry into the Vicksburg market and the advantages to practicing in Vicksburg are relevant to the primary care market:

> I saw no barriers that would preclude us from being successful in recruiting physicians to the clinic. My experience in working in very competitive areas in Florida were that physicians were quick to look to opportunities like Vicksburg to practice, that those communities were not as competitive, the managed care had not entered the area as aggressively as it had in other areas, and there were good opportunities to develop your practice and make a nice living and have a nice life-style . . . .

(*Id.* at 1589–1590.)

Indeed, this Court would be hard-pressed to conclude that significant barriers to entry into the primary care market exist in the light of Columbia's recent and successful recruitment of three new primary care physicians to Vicksburg: Drs. Chiarito, Wooten and Venters. (Exhibit DQ–153.) Notably, Patterson testified that it took only two to three months to recruit Drs. Wooten and Venters. (Trial Tr. at 1708–09.) Also of note is the fact that Columbia succeeded in recruiting these three primary care physicians while merger discussions were pending between the Vicksburg Clinic and ParkView, and, then succeeded in signing multiyear contracts with each of the new doctors after ParkView and the Vicksburg Clinic had executed their final Merger Agreement. This fact alone gives the Court serious pause when it weighs the credibility of Dr. Eisenstadt's opinion that a timely, likely and sufficient entry of new physicians after the merger is not feasible. (*Id.* at 2171.) Coupled with Dr. Sessums's estimate that a primary care physician can build a successful practice in two to three years, and the fact that it is not uncommon for hospitals, such as Columbia, to guarantee a new physician's income for two years (the period of time generally considered necessary to establish a practice), this Court cannot conclude that a "timely" entry—even one in strict compliance with the Guidelines—is unlikely on this record. (*Id.* at 124, 126; *see also* Exhibit DQ–153 which summarizes employment contract terms and base salaries that Columbia offered to Drs. Chiarito, Wooten and Venters.) The Court therefore finds that it cannot accept Dr. Eisenstadt's opinion regarding the existence of significant entry barriers to this market.

In reaching this conclusion, the Court has not ignored the testimony of Columbia's physician recruiter, John McAfee of Hunt Company International. Mr. McAfee described problems that he has encountered with recruiting physicians to Vicksburg, in particular, and Mississippi, in general. He testified

that negative perceptions and stereotypes about Mississippi exist, which make recruitment to Vicksburg difficult. (Trial Tr. at 210, 213, 230.) However, in the light of the greater body of evidence that indicates strong entry opportunities into the Vicksburg primary care market, the Court finds that one witness's impressions about regional perceptions falls short of proving an entry barrier of any seriousness. *See Benjamin v. Aroostook Medical Center,* 937 F.Supp. 957, 966 (D.Me.1996) (barriers to entry are technical concepts which require detailed supporting evidence).

Also considered was Columbia's evidence regarding its own peculiar problems in attracting and keeping new primary care physicians among its ranks in Vicksburg. However, after listening to two weeks of testimony from a host of witnesses, many of whom were Vicksburg doctors and hospital professionals, and after reviewing a wealth of documents, this Court is overwhelmingly persuaded that the root cause of Columbia's particular problems has not been antitrust-type entry barriers. Instead, a history of strained relations and personality conflicts has permeated the Vicksburg Clinic's association with VMC and Columbia management, which has culminated in this lawsuit and has had a direct, and perhaps continuing, influence on Columbia's recruitment efforts in primary care and elsewhere. (*E.g.,* Trial Tr. at 231, 459–460, 648, 1672; Exhibit DQ–65, p. HCA4561 ("Strategic Review 1994–1995" stating that "[b]ecause of the personalities of the physicians it is very difficult to recruit to this group. We cannot allow their lack of expertise to hinder the build up of the medical staff, and we will be very political in our efforts concerning this group.")).[28]

Once again, the Court was struck by William Patterson's testimony, of which the following is exemplary:

COUNSEL: You said that there had been problems in the past with respect to recruiting primary care physicians to the

clinic. Would you describe to us what you mean by that.

PATTERSON: Well, there had been physicians who had been recruited and after a year or two had left due to personality differences in classes ... personality differences that had led individuals, specifically Dr. Loper, who I had subsequent conversations with, to leave the clinic.

(Trial Tr. at 1600–01.)

In any event, precedent instructs that courts must not dwell on an individual competitor's singular problems. In accord with the broad purpose of antitrust law, the proper focus must be on proof of harm to the market as a whole. *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 543 (2d Cir.) (interpreting *Atlantic Richfield,* 495 U.S. 328, 343–44, 110 S.Ct. 1884, 1894, 109 L.Ed.2d 333), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993); *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 708 (4th Cir.1991) (to prevent antitrust laws from becoming trivialized, the key is impact on competition as a whole within the relevant market; workplace grievances between physicians and hospitals should not be elevated to the status of an antitrust action), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992).

Considering the significant weight of evidence that proves an absence of entry barriers into the primary care market, the Court concludes that the River Region Clinic's post-merger market share, whether calculated at 58.33% as the Court has done or at the higher levels endorsed by Columbia, does not establish market power on the part of the merging primary care physicians. *Syufy,* 903 F.2d at 664 & n. 6. On the facts of this case and in the absence of proof of market power, Columbia has failed to establish a Section 7 violation in the primary care market. *Id.* at 671.

#### c. Acute Inpatient Hospital Services

As previously noted, Columbia's claim in the hospital market is a vertical one, which is premised on the theory that a post-

---

**28.** Another nonantitrust concern that has dampened Columbia's recruitment prospects is the lack of additional physical space for any new physicians at the Mission Clinic. (Trial Tr. at 1659.)

merger economic alignment between the Vicksburg Clinic and ParkView will cause physicians at the Vicksburg Clinic to steer their patients to ParkView rather than VMC. As explained by Columbia, "[t]o prevail on this claim, Plaintiff must prove that Defendants will have market power in the physician markets and that the hospital market is sufficiently concentrated such that it is capable of sustaining competitive injury." (Post-trial Letter at 10.) The Court accepts Columbia's statement of the preconditions to its success on this claim. Accordingly, because the Court has found that Columbia failed to prove market power in the physician markets as discussed in detail above, an essential precondition to the hospital claim is not satisfied. Columbia's vertical claim under Section 7 of the Clayton Act falls with its horizontal ones.

In addition to failing to satisfy the stated preconditions, Columbia has failed to prove any vertical illegality under the standard analytical framework. Although no precise formula exists for determining whether a vertical merger may lessen competition, the traditional analysis involves an examination of certain market factors, which are applied to the merger at hand. *Brown Shoe*, 370 U.S. at 328–33, 82 S.Ct. at 1525–28; *Fruehauf Corp. v. F.T.C.*, 603 F.2d 345, 353 (2d Cir.1979). Those factors include: the nature and economic purpose of the arrangement; the likelihood and size of any market foreclosure; the extent of concentration of sellers and buyers in the industry; the capital cost required to enter the market; the market share needed by a buyer or seller to achieve a profitable level of production or "scale economy"; the existence of a trend toward vertical concentration or oligopoly in the industry; and whether the merger will eliminate potential competition by one of the merging parties. *Brown Shoe*, 370 U.S. at 328–33, 82 S.Ct. at 1525–28. Some courts have added factors to the foregoing list such as the degree of market power that would be possessed by the merged entity and the number and strength of competing suppliers and purchasers. *Fruehauf Corp.*, 603 F.2d at 353. By applying these factors to a given case, courts attempt to predict the probable future consequences of a vertical merger. *Brown Shoe*, 370 U.S. at 329–33, 82 S.Ct. at 1526–28.

Columbia's presentation at trial focused largely on the first two factors in the *Brown Shoe* litany: the nature and economic purpose of the arrangement and the likelihood and size of a vertical market foreclosure. At trial, Columbia sought to prove that the purpose of the merger is to align the financial incentives of the Vicksburg Clinic physicians with those of ParkView, thereby foreclosing Columbia from the primary source of its patient admissions. Testimony suggested that 80% or more of VMC's total patient activity is attributable to Vicksburg Clinic physicians. (Trial Tr. at 533.)

Having considered the totality of the evidence, the Court finds that there is no credible evidence that postmerger financial incentives will cause the Vicksburg Clinic physicians to shift their hospital patient admissions to ParkView. It is this Court's view that the testimony and expert opinion regarding a potential shift in patient admissions to ParkView is conjecture that is based on an assumption lacking in evidentiary support. *See Fruehauf*, 603 F.2d at 354 (FTC's theory that vertical merger would provide incentive for supplier to divert sales to defendant in the event of a product shortage lacked substantial evidentiary support).[29] like the FTC's diversion

---

**29.** Illustrative of the overly speculative nature of Columbia's theory is the following excerpt from Dr. Sessums's testimony on cross-examination:

> COUNSEL: You're not suggesting to us, are you, that Dr. Kuiper and his partners at the Vicksburg Clinic would make a decision based on their equity ownership in this hospital following the merger ... to hospitalize and overrule their patients' preference because of this equity ownership?

> DR. SESSUMS: I don't know. I don't know. That requires a lot of speculation and things that I don't have any knowledge thereof.
> (Trial Tr. at 181.)

Even more illuminating is the cross-examination testimony of William Patterson, Columbia's chief executive officer at VMC:

> COUNSEL: And so you would agree, would you not, that doctors then will bring patients to Vicksburg Medical Center even though they may have a financial interest in ParkView.

theory in *Fruehauf,* Columbia's patient shift theory does not appear, on its face, to be beyond the realm of possibility. *Id.* at 355. The theory nonetheless runs counter to the overwhelming weight of the record evidence. *See id.*

The physician witnesses repeatedly testified at trial that the choice of hospital rests with the patient, not the doctor. In response to a question from the bench, Dr. Sessums testified that, since he began his practice in Vicksburg in 1983, he always leaves hospital choice to the patient. (Trial Tr. at 180.) Drs. Fagan, Habeeb, Hopson and Kuiper confirmed that the number one factor in admitting a patient to a certain hospital is the patient's preference. (*Id.* at 1098, 1537, 2517, 3011–12.) Dr. Hopson explained that, because of the historic Catholic affiliation with ParkView, religious reasons sometime underlie a patient's preference for one hospital over the other. (*Id.* at 2518–19.) The testimony of these physicians paralleled that of Columbia executive Patterson. According to Patterson, "[i]t's the patient's prerogative" in deciding where to be hospitalized. (*Id.* at 1692–93.)

While crediting patient preference as the primary determinant in hospital admissions, both Drs. Habeeb and Hopson testified that proximity to the hospital can play a role in hospital selection. Consistent with this observation, Dr. Habeeb, who is currently associated with the Vicksburg Clinic and maintains his office on the VMC campus, testified that approximately 300 of his patients were admitted to VMC last year and only three of his patients went to ParkView. (*Id.* at 1537–1538.) Dr. Habeeb noted that, when a patient comes to the Vicksburg Clinic and needs to be hospitalized, the patient is likely to find VMC the most convenient because of its proximity to the clinic. (*Id.*) Similarly, Dr. Hopson, whose practice is located across the street from ParkView, testified that he

will perform surgery at whichever hospital the patient prefers but that it is easier for him, because of proximity, to operate at ParkView. (*Id.* at 2519–20.) Dr. Hopson further testified that he earns the same surgery fee, which is based on a percentage of collections, whether the procedure is performed at VMC or ParkView. However, because of proximity, he can see more patients if they are admitted to ParkView. (*Id.*) Even William Patterson conceded that there would be a "clear preference" amongst doctors with patients in intensive care to be officed as closely as possible to the hospitalized patient in order to be responsive to their patients' needs. (*Id.* at 1703.)

In addition, the Court finds as a fact that the Vicksburg Clinic's current office lease with VMC, which expires in the year 2006, creates a countervailing economic incentive for the physicians to maintain a cooperative association with VMC. The trial testimony indicated that Quorum intends for the Vicksburg Clinic to remain at its present location on the VMC campus and that the Vicksburg Clinic physicians have made no plans to move. (*Id.* at 1014–15, 1438.) No physical space is available at the Street Clinic to house the Vicksburg Clinic physicians, and there is no land available on the ParkView campus for construction of a new office building. (*Id.* at 2603.) Thus, in the light of the Vicksburg Clinic's pressing need for office space, the physicians' concerns that VMC, as lessor, might exercise its eviction powers under the lease (*Id.* at 2980), and the issues of patient choice, religious affiliation and proximity discussed above, the Court finds that any financial incentive or alleged ability on the part of the Vicksburg Clinic physicians to shift patients to ParkView is negated by the foregoing countervailing forces. Columbia's Section 7 claim in the hospital services market is therefore denied.[30]

---

> PATTERSON: I think that that's—that that's possible.
> (*Id.* at 1692).

**30.** The Court is compelled to make a final observation regarding Columbia's financial incentive theory, which is prompted by William Patterson's response to a query from the bench:

> COURT: ... Have you talked to any of the [Vicksburg Clinic doctors] about their willingness to continue to use your facility post-merger if the merger is allowed?
> PATTERSON: Well, I don't know that I've posed that question to them directly in that sort of way. No, sir, I really haven't asked that question. I always hoped that they would but

### D. Merits of Section 2 Sherman Act Claim

 Among other things, Section 2 of the Sherman Act prohibits persons from combining or conspiring to monopolize interstate commerce among the states or with foreign nations. 15 U.S.C.A. § 2 (West Supp.1996) [hereinafter "Section 2"].[31] The terms "combine" and "conspire" are used interchangeably by the courts and refer to the same offense. *Richter Concrete Corp. v. Hilltop Basic Resources. Inc.*, 547 F.Supp. 893, 914 (S.D.Ohio 1981) (see cases cited therein), *aff'd,* 691 F.2d 818 (1982). The parties agree that the elements of a Section 2 conspiracy claim are:

1. the existence of specific intent to monopolize;

2. the existence of a combination or conspiracy to achieve that end;

3. overt acts in furtherance of the combination or conspiracy; and

4. an effect on a substantial amount of interstate commerce.

*North Mississippi Communications, Inc. v. Jones,* 792 F.2d 1330, 1335 (5th Cir.1986). One court has summarized the key requirements of a Section 2 conspiracy offense as specific intent, an agreement and at least one overt act. *Servicetrends, Inc. v. Siemens Medical Systems, Inc.*, 870 F.Supp. 1042 (N.D.Ga.1994), *amended on other grounds,* 1994 WL 776878 (N.D.Ga. June 24, 1994).

On the facts of this case, the sole Section 2 element in controversy is whether Quorum specifically intended to monopolize the relevant physician and hospital markets.

Columbia argues that the evidence in this case overwhelmingly proves that Quorum acted with specific intent to monopolize because Quorum representatives and the Vicksburg Clinic doctors consistently expressed their desire to unify the Vicksburg medical community. Unification of the Vicksburg medical community, in Columbia's view, will lead to the creation of a one-hospital town. Columbia concedes, as it must, that it also has pursued the goal of "consolidating" the Vicksburg medical community and becoming the only hospital in town (*e.g.*, Exhibits PX–103, DVC–182, DVC–186). Columbia asserts nonetheless that it has sought these goals through legitimate, competitive means such as physician recruitment, technology enhancement and improving patient care. (Trial Tr. at 1582.) In contrast, Columbia argues, Quorum seeks to achieve consolidation through an illegal and monopolistic merger that must be enjoined. Columbia's trek up the high road is somewhat tarnished by the fact that Columbia also proposed and discussed a merger deal with the Vicksburg Clinic physicians, which the physicians rejected in favor of the Quorum proposal. In addition, Columbia entertained the possibility of luring the Street Clinic away from Park-View.[32] Columbia attempts to distinguish its

---

never really made that direct inquiry as to what their plans would be in that regard. (Trial Tr. at 1721.)

The Court is perplexed by this testimony. If Columbia's executive officer at VMC, who has a professional and, in some cases, social relationship with the Vicksburg Clinic physicians, has sought no direct knowledge of the physicians' postmerger plans (notwithstanding his apparent ability to do so), how can this Court accept, instead, mere assumptions about the physicians' possible actions?

**31.** Columbia's Section 2 conspiracy claim is not to be confused with a monopolization or attempted monopolization claim under that same statute. *See* statute reproduced *supra* note 2. Indeed, the claims of monopolization, attempt and conspiracy to monopolize under the Sherman Act are separate offenses that require distinct proofs. *E.g., Joe Westbrook, Inc. v. Chrysler Corp.*, 419 F.Supp. 824, 844–45 (N.D.Ga.1976) (see case citations therein). If the Section 2 allegation in this case were based on monopoli-

zation or attempted monopolization rather than conspiracy to monopolize, there could be no Sherman Act violation by virtue of the Court's prior findings with respect to the Clayton Act claims. *Syufy*, 903 F.2d at 671 & n. 21 (by finding that defendant lacked power to set prices or to exclude competition under the Clayton Act, district court also disposed of plaintiff's monopolization and attempted monopolization under Section 2 of the Sherman Act). However, in a Section 2 conspiracy case, there is no need to consider monopoly power or market power in a relevant market. *United States v. Yellow Cab Co.*, 332 U.S. 218, 225–26, 67 S.Ct. 1560, 1564–65, 91 L.Ed. 2010 (1947), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Joe Westbrook*, 419 F.Supp. at 845.

**32.** In response to a question from the bench, Columbia executive Patterson testified:

COURT: ... [W]hat would the result be, as a practical matter, if you had been successful in

proposed merger or joint venture with the Vicksburg Clinic from that of Quorum in temporal and structural terms. According to William Patterson, he had no short-term plans or intent to use the Columbia merger proposal as a vehicle for consolidating the Vicksburg medical community. (*Id.* at 1618–20.) By its very structure, the Columbia offer would not result in an immediate unification of the Vicksburg and Street Clinics. Instead, consolidation under the Columbia proposal would occur at some point in the future and would be achieved by building market share through a variety of competitive initiatives. (*Id.*) The Quorum merger, on the other hand, will immediately consolidate the Vicksburg and Street Clinics and, according to Columbia, bring about a one-hospital town.

Quorum maintains that there is no evidence that it acted with specific intent to monopolize the physician and hospital markets. Marsha Powers, Quorum's regional vice-president, testified on cross-examination that, although she believes that Vicksburg should be a one-hospital town, achieving one-hospital status was not a goal of the merger transaction.[33] (*Id.* at 1308.) Powers explained that the reason for the transaction was not to create a regional medical center in the short term; however, the overall goal is "to develop an integrated delivery system that ... can compete on a long-term basis with the Jackson facilities." (*Id.* at 1473.) Quorum also argues that "loose talk" among the merger participants about consolidating

the Vicksburg medical community and creating a one-hospital town is not sufficient to prove specific intent to monopolize. (Defs.' Post–Trial Brief at 3.)

Several physician witnesses (Drs. Fagan, Hopson and Kuiper) consistently expressed at trial that the main reason for the merger is to create a unified medical staff. (Trial Tr. at 965, 2585, 3054.) Among the physician witnesses, Dr. Hopson explained that a unified medical community is needed: "to, one, be able to compete with Jackson, and two, to control costs." (*Id.* at 2585.) Dr. Kuiper stated that a united medical staff is needed to improve patient care in the Vicksburg Clinic and the surrounding areas. (*Id.* at 3054.) Dr. Kuiper also expressed his belief that a unified medical community will result in improved technologies and will attract needed specialists such as neurosurgeons and neonatologists to Vicksburg. (*Id.* at 2959–63.) Dr. Kuiper's hope is that such improvements will result in decreased morbidity and mortality. (*Id.* at 2960.)

Having weighed the evidence, the Court is not persuaded that Quorum entered into the merger with the specific intent of monopolizing the relevant physician and hospital markets in order to create a one-hospital town. As Drs. Fagan and Hobson testified, the idea of making Vicksburg a one-hospital town is nothing new but started when the Sisters of Mercy took over the hospital that ParkView now operates. (*Id.* at 961, 2518.) This famil-

---

your bid for the Vicksburg Clinic, which you were trying to acquire—...—and if you had also been successful in getting the Street Clinic in 1996, how would your situation then be different from the situation that the defendants in this suit are now trying to accomplish, insofar as Vicksburg and the patients are concerned?
PATTERSON: I think our situation would be similar in nature, that we would be able to attract more patients, we would be able to attract more managed care contracts, we would have the competitive advantages that my competitor now sees by purchasing the Vicksburg Clinic.
(Trial Tr. at 1602.)

**33.** ParkView Medical Corp.'s Private Placement Memorandum dated June 7, 1996 gives the following reasons for the merger:
*ParkView Corp.'s Reasons for the Merger*

The ultimate goal of the merger is to expand the current ParkView Corp. integrated delivery system to continue to provide health care services to central and western Mississippi and eastern Louisiana as well as to enhance recruiting abilities for additional subspecialties.... Integrated delivery systems have the potential to deliver patient care more efficiently....
*Vicksburg Clinic's Reasons for the Merger*
... The main reasons were the force of competition from the Jackson–Metropolitan area market penetrating the Vicksburg market, the allowance of recruitment of specialty services to supplement various physicians' practices, the ability to utilize the highest quality of personnel which would be available for delivery of each medical service and the ability to reduce the cost of duplication of services....
(Exhibit PX–96 at 16.)

iar but elusive pursuit continues to be a strategic and competitive goal of both VMC and ParkView. (*Compare* Exhibit DVC–182, Columbia's Market Consolidation Summary *with* Exhibit PX–198, ParkView Medical Corp. outline.) Based on the documentary evidence and trial testimony, the Court finds that the evidence regarding an expressed desire to become, in William Patterson's words, the "preeminent institution" with 100% market share (Trial Tr. at 1571–72) is insufficient proof of a specific intent to monopolize. *See Reazin v. Blue Cross and Blue Shield of Kansas. Inc.*, 663 F.Supp. 1360, 1488 (D.Kan. 1987) (alleged remark that HCA intended to put a large hospital in Wichita out of business did not prove the use of anticompetitive means to achieve that result), *aff'd and remanded*, 899 F.2d 951 (10th Cir.1990), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). Instead, such expressions are (1) reminders of the historic rivalry in the Vicksburg hospital market that began with the Sisters of Mercy and continues to thrive today; and (2) the freely expressed opinions and ideas of physicians and other market participants, which have resulted from their discussions and brainstorming sessions about the ways to build an integrated health care delivery system. The simple truth is that this merger transaction is neither structured nor intended to create a one-hospital town. This is not a hospital merger. Two hospitals existed in Vicksburg before the merger, and two hospitals will exist after the merger is consummated. The dire consequences that Columbia predicts are far too remote and ephemeral to require judicial intervention at this point in time.

Even if each party to this merger ultimately wants Vicksburg to become a one-hospital town, such background hopes and desires do not abrogate the parties' credible testimony about their legitimate professional and personal intentions with respect to this transaction. The Court was most impressed by the highly credible testimony of the physician witnesses who expressed a sincere intent that this merger provide a means for improving medical services and saving patients' lives. Exemplary of the physicians' intent and motivation for entering into the merger is the following excerpt from Dr. Kuiper's testimony:

> ... I had a patient who had what's called an acute extradural hematoma. That is where, due to an injury, blood gathers between the skull and the brain itself and causes pressure on the brain. It is a potentially lethal situation, but it's also a situation that is fraught with morbid outcomes and long-term outcomes. That patient I was finally able to transfer to Jackson, but in that delay, the patient ended up with permanent neurological damage. I vowed at that time that I would never get myself—allow that sort of situation to happen again....

(Trial Tr. at 2961.)

Because the Court finds as a fact that Quorum did not enter into the merger with the specific intent to monopolize, but with the intent to provide better health care to the Vicksburg community, Columbia's Sherman Act claim is denied.

## II. Remaining Injunctive Relief Considerations

In accord with the foregoing discussion, the Court concludes that Columbia fails to qualify for permanent injunctive relief under Section 16 because it has not demonstrated, on this record, that the merger poses a significant threat of injury from an impending violation of the antitrust laws. *Zenith Radio*, 395 U.S. at 130, 89 S.Ct. at 1580. With respect to Columbia's request for preliminary injunctive relief, the foregoing discussion disposes of the first step in this circuit's four-part preliminary injunction test (i.e., a substantial likelihood of success. on the merits). As fully explained above, the Court concludes that Columbia has not demonstrated a substantial likelihood of success on the merits with respect to any of the Clayton or Sherman Act claims. Because the grant or denial of preliminary injunctive relief must be based on a reasoned application of all four factors in the Fifth Circuit's test, *H & W Indus.*, 860 F.2d at 179, the Court now analyzes the three remaining factors: the threat of irreparable injury to the plaintiff, the threat of

injury to the defendant and the public interest.

### A. Plaintiff's Irreparable Injury

 Columbia has the burden of proving a substantial threat that it will suffer irreparable injury if the injunction is not issued. *Id.* At the Court's request, the parties submitted supplemental briefing regarding the consequences of a grant or denial of injunctive relief in this action. (Plaintiff's Response to Court's Questions [hereinafter] "Plaintiff's Response"); (Responses of the Defs. to Questions Posed by the Court on Oct. 8, 1996 [hereinafter] "Defs.' Response".) In its listing of the harm that it will suffer if an injunction does not issue, Columbia sets forth five points. First, Columbia repeats its argument that the Vicksburg Clinic doctors will have the ability and financial incentive to steer patients away from VMC and admit them to ParkView. (Plaintiff's Response at 5.) For the reasons discussed in Part I.C.3.c. above, the Court rejects this argument.

Columbia's second point is similar to its first. Columbia argues that the Vicksburg Clinic doctors will chose to perform high profit-margin procedures (e.g., surgical and outpatient procedures [34]) at ParkView rather than VMC, which will have an adverse effect on VMC's profits. However, as discussed at length above, this Court cannot credit unsubstantiated conjecture about what actions the doctors might take after the merger. In addition, the trial testimony demonstrates that Columbia does not lack options for competing with ParkView in these areas. Dr. Eisenstadt testified that Columbia's plans to add an ambulatory surgery center at VMC, for which $8,000,000 in capital expenditure funds were included in its FY'96 budget, could provide a competitive response to the merger. (Trial Tr. at 2284, 2287, 2406–07.)

Third, Columbia states that the combined market power of the doctors will permit them to exclude VMC from competing effectively for managed care contracts. The Court disposed of this assertion in its discussion of the merits of Columbia's Clayton Act claims by

finding that Columbia failed to prove post-merger market power in the physician markets. The Court also notes that Columbia failed to define a proper managed care submarket as discussed in Part I.C.1.c. above. Finally, the testimony of Charles Pitts clearly demonstrates that, with or without the merger, Columbia will continue to have significant leverage in competing for managed care contracts because of its far-reaching and well-established regional and national health care systems. As Pitts testified on cross-examination, his managed care company is interested in contracting with the Columbias and Quorums of the industry on a regional or national basis, as opposed to contracting with them for a single local market. (*Id.* at 349–54.)

The fourth harm that Columbia cites involves a prediction that VMC's revenues will decrease and that VMC's certificate of need applications will not be granted. Decreased revenues at VMC, according to Dewey Greene, will make it "extremely difficult to invest further capital in a situation where our facility is not a performer...." (*Id.* at 555.) A potential financial decision to shift vast sums of available investment capital from one property to another is speciously far from stating the type of severe financial harm that might merit injunctive relief. *E.g., Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro. S.A.,* 875 F.2d 1174 (5th Cir.1989) (general rule is that preliminary injunctive relief is inappropriate where the potential harm to the movant is strictly financial; exception exists in extreme cases such as bankruptcy), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). Likewise, a presupposed denial of pending or future certificate of need applications demonstrates no immediate injury to Columbia.

The final injury alleged is a vague and overly broad assertion that the viability of VMC will be compromised. The only specific reason given for this assertion is, once again, that hospital patient activity generated by the Vicksburg Clinic physicians will shift to ParkView. Columbia claims that the

---

**34.** The Court notes that Columbia expressly excluded outpatient services from its definition of the relevant hospital services market in its Clay- ton and Sherman Act claims. (Plaintiff's Proposed Findings of Fact and Conclusions of Law ¶ 119.)

presumed patient shift will reduce VMC's patient volume, which will reduce VMC's viability, which will lead to a one-hospital town. For all of the reasons given in Part I.C.3.c. above, the Court finds that this assertion is unsupported by the record and fails to demonstrate irreparable injury. The Court concludes that none of the harms cited by Columbia constitute immediate, irreparable injury. *See Pearl Brewing*, 1993 WL 424236 at *5. In each instance cited, the harm is either conjectural or one that, on this record, does not rise to the level of judicial intervention. After reviewing two weeks of trial testimony and a large volume of documentary evidence, the Court is convinced that this merger will not hinder Columbia from remaining in Vicksburg and competing in the medical service markets, if it so chooses. The choice is Columbia's, which the documentary evidence in this case clearly proves. *See e.g.*, documentary evidence regarding Columbia's postmerger options and plans for remaining in the Vicksburg market at Exhibits DQ–116 ("Business Plan" for postmerger competitive strategies and market expansion); DQ–140, DVC–188, DVC–214 (copies of 2/29/96 memorandum from William Patterson to Dewey Greene regarding ten-point plan to offset the Vicksburg Clinic's move to Quorum); DQ–190 (Columbia/VMC "Action Plan" including time table for executing merger responsive strategies such as new practice acquisition, marketing and product development, expansion toward Tallulah, Louisiana and other areas, political efforts, press campaigns and legal initiatives (e.g., "Block the deal/antitrust" and "Sue Quorum")); DVC–212 (William Patterson's handwritten outline of competitive steps to take if the Vicksburg Clinic moves to Quorum; includes discussion points that state: "Regardless of outcome we ... are not leaving...." ).

While it may turn out that Columbia is not perceived as the number one health care facility in Vicksburg after the merger, the antitrust laws do not guarantee perpetual number one ranking to any single competitor. *Brown Shoe*, 370 U.S. at 320, 82 S.Ct. at 1521 (antitrust laws protect competition, not competitors). If anything is clear to this Court after presiding over the trial, it is that Columbia has the necessary financial and human resources, as well as the business experience and acumen, to remain in Vicksburg after the merger and continue competing with ParkView. An added advantage is that Columbia is already well-established in what appears to be, on this record, a growth market with emerging opportunities in managed care contracting and elsewhere. Should Columbia slip to "number two" in the local rankings, this would not constitute irreparable injury under our precedent but would present, instead, a business opportunity to just try harder. *See Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins. Inc.*, 784 F.2d 1325, 1338 (7th Cir.1986) ("injuries to rivals are byproducts of vigorous competition, and the antitrust laws are not balm for rivals' wounds").

## B. Defendants' Injury

In assessing whether the threatened injury to Columbia outweighs the threatened harm to Quorum, the Court has considered, among other things, Quorum's list of likely consequences if the injunction should issue (Defs.' Response at 1–2) and the credible trial testimony of several physician witnesses. (*E.g.*, Trial Tr. at 980, 2517, 2527, 2569.) Having already found as a fact that a strained relationship exists between the Vicksburg Clinic physicians and Columbia (*e.g., id.* at 1044), the Court believes that enjoining the merger would only deepen this rift and create even greater turmoil and animosity within the Vicksburg medical community. This would not only damage Quorum, but could potentially place all health care recipients in the Vicksburg area at risk.

The Court also notes that the physician testimony consistently indicates a belief that, without the merger, the doctors will be unable to carry out their plans to recruit needed specialists to Vicksburg such as a pulmonologist, rheumatologist, neurologist and others. The Court therefore concludes that, if the merger were enjoined, the harmful impact on Quorum, and particularly on the Vicksburg Clinic physicians who would be deprived of practicing their profession in a supportive and constructive work environ-

ment, outweighs the conjectural or transitional injury to Columbia discussed above.

## C. Public Interest

 The final step in a preliminary injunction analysis is to determine whether the plaintiff has shown that the injunction will not disserve the public interest. The Court views the public interest analysis in this case as a two-part inquiry: first, whether permitting the merger to go forward will result in better medical services for the Vicksburg community and outlying areas; and second, whether health care costs to consumers will rise if the merger is not enjoined.

With respect to the first inquiry, the evidence is convincing that medical services in Vicksburg should improve after the merger because of (i) an increase in the recruitment of needed specialists and subspecialists; and (ii) collaborative efforts by the physicians to procure technologically advanced medical equipment. The Court is persuaded that the combined and, most importantly, cooperative recruitment initiatives of the two clinics will attract new specialists to Vicksburg. Every physician witness who testified at trial, including Dr. Sessums of the Mission Clinic, acknowledged that the merger could attract new specialists to Vicksburg. (*Id.* at 127, Dr. Sessums' testimony that the merger could attract other specialties if there was a large enough group of patients to support a specialists; *see, e.g., id.* at 968, Dr. Fagan's testimony that the merger will permit recruitment of a pulmonologist, neurosurgeon, neonatologist and others.) Currently, a Vicksburg area resident who is in need of such specialists must travel to Jackson or some other sophisticated medical center for specialized care. There can be no doubt that having these specialists in Vicksburg will benefit the public.[35]

The Court is also convinced by the testimony of Drs. Kuiper (*id.* at 2982) and Hopson (*id.* at 2517) that merging the clinics can result in the physicians working together to procure much-needed, technologically ad-

vanced medical equipment that will benefit the Vicksburg community. A number of witnesses testified about the "certificate of need wars" within the Vicksburg medical community and the longstanding battles between the clinics and the hospitals in their individual efforts to secure state approval for a cardiac catherization laboratory and other medical equipment. (*E.g., id.* at 995–96; 1097; 2517.) The twelve to fifteen year political gridlock in obtaining a cardiac catherization unit for the Vicksburg community was aptly described by Dr. Hopson: "It's been fight, fight, fight, fight." (*Id.* at 2517.) This Court finds it regrettable that years of bickering within the medical community has played a role in depriving Vicksburg area residents of much-needed life saving equipment. On this record, there can be no question that the current situation creates an untenable disservice to the community at large. Considering the public harm that will be caused by maintaining the status quo, the Court finds that the merger offers a reasonable business solution for mending the fault line that has divided the Vicksburg and Street Clinics. It is this Court's view, based largely on the credible testimony of the physician witnesses, that the fusion of these clinics will foster cooperative, rather than divisive, efforts among the doctors to work together in obtaining advanced medical equipment for the community.

In evaluating the injunction's potential impact on the public interest, the Court also has given careful consideration to the evidence regarding an alleged price increase in medical services that may result from the merger. Columbia has argued throughout the course of this litigation that the merger will eliminate competition between the Vicksburg and Street Clinic doctors, lead to a one-hospital town, and thereby raise physician and hospital service prices for Vicksburg area residents. In support of this allegation, Columbia's expert, Dr. Eisenstadt, opined that the likely competitive effect of the transaction is higher prices. (*Id.* at 2154.) Dr. Eisenstadt's opinion was not, however, sup-

---

**35.** As Dr. Hopson explained:

I think the citizens will have more services in Vicksburg than they have ever had before if [the merger is] allowed to go through. I think

they will have to travel less miles. I think they will actually have better medical care.

(Trial Tr. at 2599.)

ported by any empirical evidence such as price studies of comparable markets where hospitals and/or clinics previously have merged. (*Id.* at 2341–42.)

The Court finds more compelling the evidence that other market forces (such as the growth in managed care contracting, nonnegotiable or standardized pricing in certain government programs and Blue Cross Blue Shield contracts, and the perception amongst Vicksburg physicians that the Jackson medical community poses a competitive threat) will keep postmerger price increases at bay. (*Id.* at 189, 438, 1504–05, 2584, 2604, 3075.) For example, Charles Pitts testified that, if reasonable prices for specialists' services were unavailable in Vicksburg, his managed care company would contract instead with Jackson specialists. (*Id.* at 361.) Pitts further testified that the interest in negotiating managed care contracts on a regional basis could make it illogical for a hospital services provider to raise prices in one market at the risk of losing managed care contracts in other regions. (*Id.* at 353–54.) Marsha Powers of Quorum testified that, realistically, Quorum has little to no ability to raise prices for 85% of its hospital revenue sources (i.e., Medicare, Medicaid, Blue Cross Blue Shield, other existing managed care contracts and workers' compensation). With respect to the remaining 15% of revenues (i.e., self-pay and commercially insured patients), Powers testified that Quorum would have little incentive to raise the prices charged to those patients because doing so would create a risk of losing Quorum's best paying clients. (*Id.* at 1441–46.) The Court further notes that Dr. Sessums of the Mission Clinic testified that he had no plans to raise his prices by a hypothetical 10% after the merger. (*Id.* at 135.) Dr. Hopson expressed his expectation that the citizens of Vicksburg may enjoy lower medical service costs following the merger. According to Dr. Hopson, lower prices are a possibility because a number of cost savings will result from merging the clinics and eliminating the duplication of services that currently exists between them. Such cost savings conceivably could be passed on to the patients. (*Id.* at 2525, 2600, 2605.)

In the light of the foregoing, Columbia has failed to convince this Court that the merger is likely to cause price increases in medical services. Considering the totality of the record evidence, this Court has no doubt that granting the injunction would perform a disservice to the Vicksburg area public. Columbia's request for preliminary injunctive relief is therefore denied.

### III. Conclusion

Having seriously studied and considered the record as a whole, it is this Court's firm conviction that the challenged merger is neither the product of a concerted effort to monopolize nor likely to stifle competition to any substantial degree in the relevant markets. This record clearly demonstrates that the proposed merger is not an aberrant transaction that violates the spirit or letter of the antitrust laws. Instead, it is the natural byproduct of a rapidly evolving medical services market in which the key players are jockeying for position in a highly competitive race to provide quality services at reasonable prices. Rather than eliminate or lessen competition, the evidence indicates that the merger is likely to stimulate market competition, particularly in the light of Columbia's documented, multifaceted strategies for actively competing in Vicksburg after the merger. Importantly, the evidence also demonstrates that granting the requested injunction is likely to cause a genuine disservice to the public.

It is therefore the decision of this Court that Columbia's requests for (i) preliminary and permanent injunctive relief; (ii) an adjudication that the merger violates Section 7 of the Clayton Act and Section 2 of the Sherman Act; (iii) an award of costs and attorneys' fees; and (iv) other relief, including rescission of any part of the transaction that already may have occurred, are denied in their entirety. Because the Quorum defendants are the prevailing parties in this matter, the Court finds that costs should be assessed against Columbia.

The Court also has before it the plaintiff's Emergency Motion for an Injunction Pending Appeal. An Order and Final Judgment will be entered herein as soon as the Court

has had an opportunity to consider the motion.